**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 5, 2013**

# In the Court of Appeals of Georgia

A13A0255. BAKER et al. v. HUFF.

A13A0256. LIBERTY MUTUAL INSURANCE COMPANY v. HUFF.

A13A0257. JONES v. HUFF.

ANDREWS, Presiding Judge.

These consolidated appeals arise from assorted litigation spawned by a single-car accident in December 2002 in which Harlan Huff was killed when he lost control of his car and hit a tree, and his adult son, Joshua Huff (Joshua), a passenger in the car, was seriously injured. Liberty Mutual Insurance Company provided a liability insurance policy on the car with policy limits of $100,000 per person. In pursuit of a personal injury claim against the Estate of Harlan Huff (Harlan's Estate), Joshua made time-limited offers to Liberty Mutual to settle the claim for the policy limits.

Liberty Mutual eventually tendered the policy limits, but not within the time deadline, and Joshua rejected the tender. Joshua's personal injury suit was tried in January 2006 resulting in a $278,806 judgment against Harlan's Estate. Liberty Mutual paid the $100,000 policy limits to partially satisfy the judgment, leaving an unpaid judgment against Harlan's Estate in excess of the policy limits in the amount of $178,806, and leaving Harlan's Estate with a potential claim against Liberty Mutual for the unpaid judgment based on allegations that Liberty Mutual acted in bad faith or negligently by failing to accept the time-limited offers to settle Joshua's claim for the policy limits.

Patricia Huff,[1] the executrix of Harlan's Estate, refused Joshua's request for assignment of the Estate's claim against Liberty Mutual. As executrix, Patricia Huff hired an attorney, Bonnie Baker of the law firm of Meadows & Macie, P.C. (where Patricia worked as a paralegal) to represent Harlan's Estate. Baker negotiated with Liberty Mutual to attempt to settle the Estate's claim, but Huff, as executrix, refused to sign a draft agreement purporting to settle the claim for $15,000. Liberty Mutual unsuccessfully sued to enforce the settlement, ultimately resulting in this Court's decision in *In re Estate of Huff*, 287 Ga. App. 614 (652 SE2d 203) (2007), ruling that

---

[1] Patricia Huff was Harlan Huff's wife and Joshua Huff's stepmother.

there was no settlement agreement. In the meantime, Patricia Huff, as executrix, eventually offered to assign the Estate's claim against Liberty Mutual to Joshua, but Joshua refused the offer and filed a motion in the probate court seeking removal of Huff as executrix of Harlan's Estate. In April 2007, the probate court granted the motion; removed Patricia Huff as executrix of Harlan's Estate; and appointed Joshua as administrator (with the will annexed) of Harlan's Estate.

This brings us to the litigation the subject of the present appeals. Harlan's Estate (acting by its administrator, Joshua) filed a complaint in October 2008 alleging causes of action against the following defendants: (1) against Liberty Mutual – alleging bad faith, negligence, and breach of contractual obligations by failing to accept the time-limited offers to settle Joshua's claim against Harlan's Estate for the policy limits; (2) against Liberty Mutual, Baker, and the Estate of Patricia Huff (represented by Rhonda Jones, as executrix)[2] – alleging violation of the Uniform Fraudulent Transfers Act (UFTA) (OCGA § 18-2-70 et seq.) by a conspiracy to settle the bad faith/negligence claim possessed by Harlan's Estate for less than its true value; (3) against Baker and Meadows & Macie, P.C. – alleging legal malpractice, negligence, and breach of fiduciary duty by failing to properly represent the interests

_____

[2] Patricia Huff died before Harlan's Estate filed the complaint.

3

of Harlan's Estate, and (4) against the Estate of Patricia Huff – alleging breach of fiduciary duty owed to Harlan's Estate by actions taken by Huff, as executrix of the Estate, authorizing or approving settlement of the Estate's bad faith claim for less than its true value. The trial court denied motions for summary judgment filed by all the named defendants and granted certificates of immediate review. We granted applications for interlocutory appeals from the denial of summary judgment brought by: Liberty Mutual in Case No. A13A0256; Meadows & Macie, P.C. and Bonnie Baker in Case No. A13A0255; and Rhonda Jones, as executrix of the Estate of Patricia Huff, in Case No. A13A0257.

## Case No. A13A0256

1. Liberty Mutual moved for summary judgment on the causes of action for bad faith or negligent failure to settle within the policy limits; for breach of contract; and for violation of the UFTA.

(a) We first consider the claim by Harlan's Estate that Liberty Mutual acted in bad faith or negligently when it failed to accept Joshua's time-limited offers to settle his personal injury claim for the policy limits.

On March 18, 2003, Liberty Mutual received a medical authorization from Joshua (prior to being represented by an attorney) pursuant to which Liberty Mutual

4

obtained (on or about May 22, 2003) medical records and bills relevant to the December 26, 2002 automobile accident showing that Joshua had suffered a fractured ulna (forearm) and a cerebral contusion in the accident and had medical bills of about $35,000. The medical records obtained as of that date showed that, as a result of the cerebral contusion, Joshua had initially suffered substantial hemiparesis (weakness) and numbness on his right side. The records showed that Joshua was discharged from a hospital in Atlanta three days after the accident "ambulating as tolerated with [a] cane" with directions to follow-up in one to two weeks (when he returned to his Texas residence) with orthopedic and neurological consultations and to continue with physical therapy. The medical records subsequent to the hospital discharge showed that Joshua's injuries had substantially improved since the accident. A January 23, 2003 progress note from a family health center in Texas states "hemiparesis showing great improvement." Records from a Texas orthopedist showed that the fractured ulna had fully healed as of early May 2003. The medical records also showed evidence that Joshua had sustained a prior head injury in a 1995 automobile accident that required craniofacial surgery. Although Joshua's family health center and orthopedic records showed that a neurological consultation was scheduled, there was nothing in the medical records obtained by Liberty Mutual on May 22 showing that Joshua had

5

followed up with a neurological consultation to evaluate his right-side impairments as a result of the cerebral contusion, or that he had continued physical therapy as directed.

On May 23, 2003, Michael Neff sent a letter informing Liberty Mutual that he was representing Joshua as his attorney on a personal injury claim against Liberty Mutual's insured (Harlan's Estate) arising out of the accident. The letter informed Liberty Mutual that "[o]ur office will prepare a complete closing brochure highlighting our clients's injuries at the conclusion of our client's medical treatment." On May 27, 2003, Liberty Mutual's representative responded by letter asking Neff to make Joshua available for a recorded statement to enable Liberty Mutual to investigate the accident and to "independently verify the extent of injuries and treatment." Liberty Mutual did not question that its insured was liable for Joshua's injuries resulting from the accident. On May 30, 2003, Neff responded by letter requesting that Liberty Mutual provide him with copies of all the medical records it had obtained and refusing to make Joshua available for a statement. On June 19, 2003, Neff sent a letter to Liberty Mutual stating that:

> [I]n light of the clear liability in this case and the tragic damages, I hereby am making a demand pursuant to *Southern Gen. Ins. Co. v. Holt*, 262 Ga. 267, 416 S.E.2d 274 (1992) for the entire policy limits in the

6

amount of $100,000. This offer is open for ten days. In the event that you do not tender policy limits within that time, you are exposing your insured's estate to an excess judgment. . . . Furthermore, kindly treat this letter as Mr. Huff's cancellation of his authorization for Liberty Mutual to obtain medical records or any other documents concerning his health. I will be quite happy to provide any additional information that I receive to Liberty Mutual.

Although the letter does not explicitly state that it is an offer to settle Joshua's claim for the policy limits, it references the *Holt* case, and Liberty Mutual does not dispute that it was an offer to fully settle for the policy limits. The June 19 letter enclosed no medical or billing records; no information regarding Joshua's special or other damages; and no information about his current treatment or medical condition. Neff testified that the June 19 letter was not the "complete settlement brochure" that he informed Liberty Mutual would be sent at the conclusion of Joshua's treatment.

On June 27, 2003, within ten days of the June 19 *Holt* offer, the Liberty Mutual representative spoke to Neff by telephone and Neff agreed to give Liberty Mutual photographs of the accident in exchange for Liberty Mutual's agreement to send Neff the medical records it had obtained in May 2003. The Liberty Mutual representative testified that, during the conversation, he asked Neff for additional medical bills and records, and asked if Joshua was still receiving medical treatment. Neff told him he

had no records and did not know if Joshua was still receiving treatment.[3] According to Neff, the Liberty Mutual representative

> asked me about what I had, and I didn't have anything. So I think he asked me what I didn't have or what don't we have, and I didn't know because I didn't know what we had. So it was a little bit of a situation where I was not sure and he was not sure, other than the fact the meds were $35,000.

Under these circumstances, the representative told Neff that Liberty Mutual was not prepared to tender the policy limits. On June 30, 2003, Liberty Mutual sent a letter to Neff confirming the agreement that Liberty Mutual would send him copies of the medical records and stating that the claim was still under review. Neff testified that, because the 10-day offer period in the June 19 *Holt* offer expired on June 29, and Liberty Mutual did not expressly ask him for any additional time to consider the offer, the window to settle for the policy limits had closed. During a July 14, 2003 telephone conversation, the Liberty Mutual representative again asked Neff if Joshua was receiving further treatment and Neff did not know. In that conversation, the representative offered to settle Joshua's bodily injury claim for $43,000, and on July 30, 2003, Liberty Mutual sent a letter to Neff confirming the $43,000 offer. Neff

---

[3] Joshua subsequently testified that he could not recall if he was still receiving medical treatment at that point.

responded by letter on July 31, 2003, rejecting the $43,000 offer, and informing Liberty Mutual that "Joshua has started physical therapy and has an appointment with the neurosurgeon on August 13 to evaluate his continuing limitations." Neff testified that he erroneously referred in the letter to a neurosurgeon, and that Joshua saw a neurologist on August 13, 2003. In a subsequent affidavit regarding Liberty Mutual's $43,000 settlement offer in the July 14 telephone conversation, Neff stated that he believed Liberty Mutual was not sufficiently considering Joshua's injuries resulting from the cerebral contusion, and that "I realized that Liberty Mutual had to be given more explicit proof of brain injury." Neff gave subsequent testimony explaining his affidavit, stating that he was "shocked" that Liberty Mutual needed additional proof, and that he "had to mule-lead [Liberty Mutual] to a conclusion that they needed to tender policy limits, and [he] couldn't do it, not in a timely manner."

On October 22, 2003, Neff provided Liberty Mutual with the neurologist's August 13, 2003 medical records when he sent Liberty Mutual a package described as a "settlement brochure" including a letter and attachments. The attached medical records from the neurologist showed that Joshua's right-side impairments as a result of the cerebral contusion suffered in the December 26, 2002 accident had continued to improve. The neurologist noted that the initial impairment on his right side arm and

9

leg "has gotten better but he still doesn't have good fine motor skills." The neurologist found that his cognitive skills were back to normal and the only remaining numbness was in "the right big toe." The neurologist concluded, however, that, as a result of the cerebral contusion Joshua suffered in the accident, he continued to have "residual right hemiparesis and spasticity" causing a sustained clonus (ankle jerk) that "probably won't go away." The October 22 letter in the "settlement brochure" package specified special damages for medical expenses and lost wages as a result of the accident in the amount of $44,586.79, and calculated pain and suffering over Joshua's life expectancy for permanent impairments arising from the injuries suffered in the accident in the amount of $274,480. The October 22 letter also stated that "based on the enclosed information" Joshua was making a *Holt* demand, open for ten days, for "payment of the full policy limits [of $100,000] in exchange for a full release." But on October 28, 2003, prior to expiration of ten days from the October 22 offer, Neff sent another letter to Liberty Mutual stating that it was his understanding that Liberty Mutual had not received the October 22 letter; enclosing a copy of the October 22 letter; and further stating that: "Please be advised that Joshua is willing to accept $100,000 to compensate him for his pain and suffering

only. The settlement release should indicate that the amount tendered is meant to partially compensate him for his pain and suffering."

On November 4, 2003, Liberty Mutual responded with a letter to Neff acknowledging receipt of the October 28 letter and stating that "[w]e are sending the medical records out for a medical review so [we] will be unable to respond to your demand within the time frame you requested." Neff testified that, after the ten days expired from the October 22 letter, the offer to settle for the $100,00 policy limit expired and the window for settlement closed. In January 2004, after receiving the results of an expert medical review, Liberty Mutual tendered the $100,000 policy limit to settle Joshua's bodily injury claim. Joshua refused Liberty Mutual's offer to settle for the policy limits, and sued Harlan's Estate for injuries he suffered in the accident.

"An insurance company may be liable for the excess judgment entered against its insured based on the insurer's bad faith or negligent refusal to settle a personal claim within the policy limits." *Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 684 (580 SE2d 519) (2003). An insurer must "[act] reasonably in responding to a settlement offer, bearing in mind that, in deciding whether to settle, the insurer must give the insured's interests [in avoiding liability for a judgment in excess of the policy

11

limits] the same consideration that it gives its own [interests in paying less than the policy limits]." *Fortner v. Grange Mut. Ins. Co.*, 286 Ga. 189, 190 (686 SE2d 93) (2009) (punctuation and citation omitted); *Brightman*, 276 Ga. at 685. To promote equal consideration of these interests, the applicable standard of care requires that the insurer "must use such care as would have been used by an ordinarily prudent insurer with no policy limit applicable to the claim." *U. S. Fidelity & Guaranty Co. v. Evans*, 116 Ga. App. 93, 94-95 (156 SE2d 809) (1967) (punctuation and citation omitted); see *Fortner*, 286 Ga. at 190 (actions judged by standard of ordinarily prudent insurer). An ordinarily prudent insurer does not incur liability "solely because it fails to accept a settlement offer within the deadline set by the injured person's attorney." *Southern General Ins. Co. v. Holt*, 262 Ga. 267, 269 (416 SE2d 274) (1992). As *Holt* points out, liability for an excess judgment cannot be based on an insurer's failure to accept a time-limited offer to settle within the policy limits which, considering all the circumstances, imposes an unreasonably short period of time to respond. Id. "Rather, the issue is whether all the facts show sufficient evidence to . . . permit a jury to determine whether the insurer acted unreasonably in declining to accept a time-limited settlement offer." Id. To find that the insurer acted unreasonably in declining to accept a time-limited settlement offer, the facts must be sufficient to permit a jury

12

to find that no ordinarily prudent insurer would have declined to accept the offer. See *Fortner*, 286 Ga. at 190 (whether insurer acted reasonably is judged by standard of ordinarily prudent insurer). Moreover, whether the basis for imposing tort liability on the insurer is phrased in terms of bad faith or negligence, an insurer may be liable for damages for failing to settle for the policy limits "if, but only if, such ordinarily prudent insurer would consider that choosing to try the case [rather than accept an offer to settle within the policy limits] would be taking an unreasonable risk [that the insured would be subjected to a judgment in excess of the policy limits]." *Evans*, 116 Ga. App. at 94-95 (punctuation and citation omitted); *Brightman*, 276 Ga. at 684-685 (citing "unreasonable risk" test in *Evans*, supra); *McCall v. Allstate Ins. Co.*, 251 Ga. 869, 870 (310 SE2d 513) (1984). This is generally a jury issue requiring consideration of all the relevant circumstances including the insurer's knowledge of facts relevant to liability and damages on the claim; the insurer's diligence in conducting a reasonable investigation to discover the relevant facts; and the terms of the settlement offer and any response by the insurer. see *Holt*, 262 Ga. at 268-269; *Brightman*, 276 Ga. at 685-686; *Fortner*, 286 Ga. at 190-191. An insurer has no affirmative duty "to engage in negotiations concerning a settlement demand that is in excess of the insurance policy's limits." *Brightman*, 276 Ga. at 687.

13

Harlan's Estate contends that Liberty Mutual is liable on a claim for bad faith or negligent failure to settle based on the failure to accept Joshua's time-limited June 19 and October 22/28 offers to settle his claim for the $100,000 policy limits.

We reject Liberty Mutual's contention that it was entitled to summary judgment on this claim solely because Joshua's special damages were less than the $100,000 policy limits. Citing to *Holt* and *Brightman* supra, Liberty Mutual contends that, because the special damages were less that the $100,000 policy limit, as a matter of law, it had no duty to respond to a time-limited offer to settle for the policy limit. *Holt* rejected the insurer's argument that it had no duty to its insured to respond to a deadline to settle a claim within the policy limits, and pointed out that the insurer had knowledge of clear liability and of special damages exceeding the policy limits. *Holt*, 262 Ga. at 269. The issue, as *Holt* points out, was whether, considering all the facts, there was sufficient evidence to "permit a jury to determine whether the insurer acted unreasonably in declining to accept a time-limited settlement offer." Id. Moreover, *Holt* found that the insurer's liability in that case was not based solely on its failure to settle the claim within the deadline set by the plaintiff's attorney, but also on other evidence showing that, by failing to settle within the policy limits, the insurer failed in its duty to give equal consideration to the interests of its insured. Id. Citing to the

14

*Holt* ruling, *Brightman* found that the insurer "had a duty to its insured to respond to the plaintiff's deadline to settle the personal injury claim within policy limits when the insurer had knowledge of clear liability and special damages exceeding the policy limits." *Brightman*, 276 Ga. at 685. *Brightman* noted that "[o]ur holding in *Holt* was consistent with the general rule that the issue of an insurer's bad faith depends on whether the insurance company acted reasonably in responding to a settlement offer." Id. at 685. Accordingly, *Holt* and *Brightman* simply found that it was unreasonable for the insurer to fail to respond to a time-limited offer to settle within the policy limits when the insurer had knowledge of clear liability and special damages exceeding the policy limits. Contrary to Liberty Mutual's contention, *Holt* and *Brightman* cannot be construed as holding that it is always reasonable for an insurer not to respond to a time-limited offer to settle within the policy limits when special damages do not exceed the policy limits.

As to the settlement offers conveyed in the October 22 and October 28 letters, we find no basis for imposing liability on Liberty Mutual for failing to accept these offers. The October 22 letter conveyed an offer, open for ten days, to settle Joshua's bodily injury claims and provide a full release for the $100,000 policy limits. The October 28 letter (which enclosed a copy of the October 22 letter) advised Liberty

15

Mutual that Joshua was "willing to accept $100,000 to compensate him for his pain and suffering only," and stated that the release should show that this sum was to partially compensate Joshua for his pain and suffering. We find that the October 28 letter modified the offer made in the October 22 letter and constituted a new offer to accept the policy limits for a partial settlement of pain and suffering damages only. This was not an offer to fully settle a claim within the policy limits to which Liberty Mutual had a duty to respond under *Holt*, supra. Rather, the October 28 offer to settle only pain and suffering damages for the policy limits, in effect, invited Liberty Mutual to engage in negotiations to fully settle the claim, which included additional damages for medical expenses and lost wages, for an amount in excess of the policy limits. As set forth above, Liberty Mutual had no duty "to engage in negotiations concerning a settlement demand that is in excess of the insurance policy's limits." *Brightman*, 276 Ga. at 687. Harlan's Estate argues that it was not Neff's intention in the October 28 letter to modify the October 22 *Holt* offer to fully settle the claim for the policy limits, but only to direct that the $100,000 be allocated to pain and suffering damages. Whatever Neff may have intended, we find that the plain language of the October 28 letter had the effect of modifying the October 22 *Holt* offer. To the extent the negligent or bad faith failure to settle claim was based on Liberty Mutual's

16

failure to accept settlement offers made in the October 22 or October 28 letters, Liberty Mutual was entitled to summary judgment. Id.

As to the time-limited offer to fully settle the claim for the policy limits within ten days, conveyed in the June 19 letter, we find on the present record that the facts are not sufficient to permit a jury to find that no ordinarily prudent insurer would have declined to accept the settlement offer within the deadline. Accordingly, there is no basis in the record for a jury to find that Liberty Mutual's failure to accept the settlement offer within the deadline was unreasonable. It follows that Liberty Mutual was entitled to summary judgment on the claim that it acted in bad faith or negligently in failing to accept the June 19 settlement offer. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

When Liberty Mutual received the June 19 offer to settle for the policy limits within ten days, the available information regarding Joshua's injuries, along with actions taken by Neff, left it with no reasonable option but to decline to tender the $100,000 policy limits within the deadline. Neff refused Liberty Mutual's request for a statement from Joshua shortly before making the settlement offer and revoked Liberty Mutual's medical authorization in the settlement offer. The settlement offer contained no current medical records; no information about current treatment or

17

current medical condition; and no statement of special or other damages. In the June 19 letter, Neff offered to "provide any additional information that I receive," but when Liberty Mutual contacted him within the ten-day offer period and asked for additional medical and billing records, Neff said he had nothing and knew only that the medical bills were $35,000. At that point, Liberty Mutual had only the medical and billing records it previously obtained on or about May 22, the day before Neff gave notice that he represented Joshua. The billing records showed medical expenses of about $35,000. The medical records showed that the fractured forearm had fully healed. As to the right-side impairment Joshua suffered as a result of the cerebral contusion, the records showed that the impairment was substantially improving. The records also showed that Joshua had been instructed to obtain a neurological consultation to evaluate the extent of the impairment, and to get physical therapy. But there was nothing in the medical records showing that Joshua had obtained a neurological consultation or physical therapy. Accordingly, when Liberty Mutual received the ten-day offer to settle on June 19, it did not know the extent of the impairment, whether the impairment had continued to improve, whether the impairment had resolved, whether any residual impairment was temporary or permanent, or whether the impairment was related to Joshua's prior 1995 head injury.

18

Furthermore, Liberty Mutual had no means at that point to obtain additional information to value the impairment. Within the ten-day offer period, Liberty Mutual asked Neff for additional medical information, got none, and informed him that, under the circumstances, it could not tender the policy limits. Although Liberty Mutual did not explicitly ask Neff for more time to obtain medical records to enable it to place a value on Joshua's impairment, Neff had already refused access to his client, revoked Liberty Mutual's medical authorization to get records, and told Liberty Mutual that he had no information about Joshua's medical treatment. It was implicit in this discussion that Liberty Mutual conveyed the message that more time was needed to obtain information to evaluate the extent of the impairment. In any event, under these circumstances, an extension of time would not have addressed Liberty Mutual's predicament. It was impossible under these circumstances for Liberty Mutual to obtain additional information needed to determine whether or not Joshua's impairment had a value which justified tendering the $100,000 policy limit. Liberty Mutual acted reasonably under the circumstances by informing Neff that it was not prepared, without more information, to tender the $100,000 policy limits to settle the claim.

This conclusion is confirmed by evidence showing that Neff eventually informed Liberty Mutual on July 31 that Joshua was attending physical therapy and had scheduled an August 13 neurological consultation. On October 22, Neff provided Liberty Mutual with the neurologist's records which confirmed that Joshua's injuries resulting from the cerebral contusion had continued to substantially improve; that his cognitive ability had returned to normal; that his numbness had resolved except for the right big toe; and that his initial right-side arm and leg impairment was better except for a deficiency in "fine motor skills." The neurologist's records also showed that Joshua had "residual" impairment with an "ankle jerk" that is probably permanent. These records, along with additional information provided by Neff on October 22 regarding Joshua's current medical expenses, lost wages, and estimated pain and suffering damages associated with the permanent impairment, gave Liberty Mutual information necessary to place a value on Joshua's right-side impairment as a result of the cerebral contusion. In response to this information, Liberty Mutual tendered the $100,000 policy limits in January 2004.

As set forth above, in responding to a time-limited settlement offer, an insurer must act reasonably, and is not required to accept an offer which, under all the circumstances, imposes an unreasonable short period of time to respond. *Holt*, 262

Ga. at 269; see *Government Employees Ins. Co. v. Gingold*, 249 Ga. 156 (288 SE2d 557) (1982) (insurer entitled to summary judgment on failure to settle claim when facts established the insurer had no reasonable opportunity to settle). On this record, we find that the facts show as a matter of law that the June 19 settlement offer was made under circumstances which provided no reasonable settlement opportunity and rendered it impossible for Liberty Mutual to determine that Joshua's injuries had a value which justified tendering the $100,000 policy limits. Although whether an insurer acted in bad faith or negligently in failing to accept a time-limited offer to settle within the policy limits is usually a jury question, we find under these circumstances that no reasonable trier of fact could conclude that Liberty Mutual acted unreasonably when it failed to tender the $100,000 policy limits within the 10-day time limit imposed in the June 19 settlement offer.[4]

---

[4] We find that the facts and circumstances which support this conclusion in the present case are matters within common knowledge and experience, and not matters on which the testimony of experts with specialized insurance knowledge is necessary. See *Raines v. Maughan*, 312 Ga. App. 303, 307-308 (718 SE2d 135) (2011). Accordingly, expert opinions produced by Harlan's Estate from an attorney and a retired insurance company employee that Liberty Mutual acted in bad faith or was negligent do not create an issue of fact. Even assuming that the issue of whether an insurer acted in bad faith or negligently in failing to accept a settlement offer may in some cases require the testimony of experts with specialized knowledge of insurance matters, "when the issues concerning a professional's conduct are not of a complicated nature, and a violation [or the absence of a violation] is established by

21

(b) Harlan's Estate alleged that Liberty Mutual's failure to accept Joshua's offer to settle for the policy limits was a breach of contractual obligations set forth in the policy and entitled the Estate to recovery damages. This was not a breach of contract but a tort claim. *Evans*, 116 Ga. App. at 94. The trial court erred by denying summary judgment to Liberty Mutual on the breach of contract cause of action.

(c) Harlan's Estate alleged that Liberty Mutual engaged in a conspiracy with others which resulted in a fraudulent transfer in violation of the UFTA for which the Estate is entitled to monetary damages. The crux of this cause of action is that Liberty Mutual and the other alleged conspirators engaged in fraudulent conduct by taking actions which diminished the value of an asset possessed by Harlan's Estate – the bad faith/negligence claim against Liberty Mutual for failing to settle Joshua's personal injury claim for the policy limits. Because we determined in Division 1 (a), supra, that Liberty Mutual was entitled to summary judgment on the bad faith/negligence claim, there was no claim and no Estate asset. The trial court erred by denying Liberty Mutual's motion for summary judgment on the claim that it engaged in a conspiracy which violated the UFTA.

clear and palpable proof, expert testimony is not required." *Ga. Real Estate Appraisers Bd. v. Krouse*, 299 Ga. App. 73, 77 (681 SE2d 737) (2009).

22

Case No. A13A0255

2. Harlan's Estate alleged causes of action against the Estate's former attorney, Bonnie Baker, and Baker's law firm, Meadows & Macie , P.C., for legal malpractice, negligence, breach of fiduciary duty, and fraudulent transfer in violation of the UFTA. All of these causes of action arose from the same allegations – that by conspiring with others to attempt to settle the Estate's bad faith/negligence claim for less than its true value, these defendants took actions contrary to the Estate's interest which diminished the value of the claim as an Estate asset. Because we determined in Division 1 (a), supra, that Liberty Mutual was entitled to summary judgment on the bad faith/negligence claim, there was no claim and no Estate asset. The trial court erred by denying the motion for summary judgment by Baker and by Meadows & Macie, P.C., on all of these causes of action.

Case No. A13A0257

3. Harlan's Estate brought causes of action against the Estate of Patricia Huff (naming Rhonda Jones as executrix) alleging that, while Patricia Huff was the executrix of Harlan's Estate, she engaged in a conspiracy with others which resulted in a fraudulent transfer in violation of the UFTA, and violated her fiduciary duty to Harlan's Estate. Both of these causes of action arose from the same allegations – that

23

Patricia Huff and others attempted to settle the bad faith/negligence claim that Harlan's Estate had against Liberty Mutual for less than its true value, and that these actions diminished the value of the claim as an asset of Harlan's Estate. Because we determined in Division 1 (a), supra, that Liberty Mutual was entitled to summary judgment on the bad faith/negligence claim, there was no claim and no Harlan's Estate asset.

The record shows that, because the Estate of Patricia Huff failed to respond to discovery served on it by Harlan's Estate, the trial court granted Harlan's Estate's motion for sanctions, struck the answer filed by the Estate of Patricia Huff, and directed entry of default against her Estate. Although the default operated as an admission of Harlan's Estate's well-pled factual allegations in the complaint, it was not an admission of conclusions of law, and did not preclude a showing under the admitted facts that no claim existed that would allow Harlan's Estate to recover. *Grand v. Hope*, 274 Ga. App. 626, 629 (617 SE2d 593) (2005). Because we found that Harlan's Estate had no bad faith/negligence claim, there is no basis for the causes of action to recover damages against the Estate of Patricia Huff for action that diminished the value of the claim as an asset of Harlan's Estate. The trial court erred

by denying the Estate of Patricia Huff's motion for summary judgment on these causes of action.

*Judgments reversed in Case Nos. A13A0255; A13A0256; and A13A0257. Dillard and McMillian, JJ., concur.*