300 Ga. 848
FINAL COPY

S16Q1875.  GRANGE MUTUAL CASUALTY COMPANY v. WOODARD et al.

PETERSON, Justice.

This appeal in a personal injury case arising from an automobile accident is before this Court on certified questions from the United States Court of Appeals for the Eleventh Circuit.  At issue is the proper interpretation of OCGA § 9-11-67.1, which governs the formation of settlement agreements pursuant to a pre-suit "offer to settle a tort claim for personal injury, bodily injury, or death arising from the use of a motor vehicle and prepared by or with the assistance of an attorney on behalf of a claimant or claimants" (a "Pre-Suit Offer").  OCGA § 9-11-67.1(a).  We conclude that OCGA § 9-11-67.1 does not prohibit a claimant from conditioning acceptance of a Pre-Suit Offer upon the performance of some act, including a timely payment.  We leave it to the Eleventh Circuit to apply this principle to the facts of this case.

1.    *Factual and procedural background*

The relevant facts are largely undisputed.  On March 20, 2014, Thomas Dempsey was driving his car in Georgia when he collided with a pickup truck

operated by Boris Woodard in which Woodard's adult daughter, Anna Woodard, was a passenger. Both Woodards were injured, and Anna died of her injuries. Dempsey's vehicle was insured under a personal automobile liability policy issued by Grange Mutual Casualty Company ("Grange") with liability limits of $50,000 per person, $100,000 per accident. Grange assigned claims representative Heather Conn to handle Boris Woodard's personal injury claim, as well as Boris and Susan Woodard's wrongful death claim for Anna. The Woodards selected T. Shane Peagler of the Law Offices of Michael Lawson Neff, P.C., to represent them in the matter.

On June 19, 2014, Peagler sent Conn a letter making a settlement offer, under the heading, "Offer to Settle Tort Claims Made Pursuant to OCGA § 9-11-67.1 and OCGA § 51-12-14." In his letter, Peagler said that the Woodards offered a limited release of their claims against the Dempseys and Grange in exchange for the $100,000 policy limit. The letter contained a list of demands under the boldface heading, "*Note:* **The following items must be noted and fully and strictly complied with in order to accept this offer[.]**" Among those demands were the following:

• "Pursuant to O.C.G.A. § 9-11-67.1, you have 30 days from your receipt

2

of this offer to accept it."

- "Your acceptance of this offer must be in writing to me at the above address shown in my letterhead. If we do not actually receive a timely acceptance, this offer will be deemed rejected, and we will file a lawsuit against your insureds to recover the total amount of losses caused by your insureds, instead of the limited amount afforded by your coverage and other coverage that may be available."

- The Dempseys and a Grange officer were required to provide affidavits swearing that the insurance coverage from Grange was the only coverage available and that no excess or umbrella policies were available. "All three affidavits must be received in my office within ten (10) days after your written acceptance of this offer to settle. Timely compliance with this paragraph is an essential element of acceptance."

- "If payment is not tendered in cash pursuant to OCGA 9-11-67.1(f)(1), payment in the amount of $50,000 must be made payable to 'Boris and Susan Woodard and Michael L. Neff, their attorney for the wrongful death of their daughter, Anna Woodard,' within ten (10) days after your written acceptance of this offer to settle. Timely payment is an essential element

3

of acceptance."

- "If payment is not tendered in cash pursuant to OCGA 9-11-67.1(f)(1), payment in the amount of $50,000 must be made payable to 'Boris Woodard and Michael L. Neff, his attorney' within ten (10) days after your written acceptance of this offer to settle. Timely payment is an essential element of acceptance."

Peagler agreed that Grange had until July 23, 2014, to accept the offer. In a letter dated July 22, 2014, Conn told Peagler, "We accept your demand as outlined in your correspondence of June 23, 2014." The letter stated that the requested affidavits and checks would follow under separate cover within ten days. Conn e-mailed Peagler the affidavits on July 29, stating that the checks were being issued that day.

Conn and Neff spoke on August 12, 2014, and Neff informed Conn that the checks had not arrived. Neff told Conn this meant the parties had not reached a binding settlement agreement. Conn offered to reissue new checks for overnight delivery, but Neff was unwilling to accept them. Conn nonetheless wrote to Neff's office after their conversation, including settlement checks with the correspondence. She apologized, explaining that the original checks were

4

issued on July 29 but there was an error in addressing them to Neff's office. On August 14, Neff sent Conn a letter returning the checks and stating that the Woodards rejected Grange's untimely response to the settlement offer and would be filing a lawsuit.

Grange filed a lawsuit against the Woodards in the United States District Court for the Northern District of Georgia. The one-count complaint alleged breach of the settlement contract and sought relief "up to and including an award of specific performance." The parties filed cross-motions for summary judgment. The Woodards argued that the parties did not reach a settlement agreement because the demand letter required Grange to remit payment timely as a condition of acceptance, which Grange failed to satisfy. Grange argued that Georgia law rendered void the Woodards' attempt to require timely payment as a condition of acceptance. Both parties cited OCGA § 9-11-67.1, which provides in relevant part as follows:

> (a)Prior to the filing of a civil action, any offer to settle a tort claim for personal injury, bodily injury, or death arising from the use of a motor vehicle and prepared by or with the assistance of an attorney on behalf of a claimant or claimants shall be in writing and contain the following material terms:
>
> > (1)  The time period within which such offer must be

5

accepted, which shall be not less than 30 days from receipt of the offer;

(2) Amount of monetary payment;

(3) The party or parties the claimant or claimants will release if such offer is accepted;

(4) The type of release, if any, the claimant or claimants will provide to each releasee; and

(5) The claims to be released.

(b) The recipients of an offer to settle made under this Code section may accept the same by providing written acceptance of the material terms outlined in subsection (a) of this Code section in their entirety.

(c) Nothing in this Code section is intended to prohibit parties from reaching a settlement agreement in a manner and under terms otherwise agreeable to the parties.

(d) Upon receipt of an offer to settle set forth in subsection (a) of this Code section, the recipients shall have the right to seek clarification regarding terms, liens, subrogation claims, standing to release claims, medical bills, medical records, and other relevant facts. An attempt to seek reasonable clarification shall not be deemed a counteroffer.

. . .

(g) Nothing in this Code section shall prohibit a party making an offer to settle from requiring payment within a specified period; provided, however, that such period shall be not less than ten days after the written acceptance of the offer to settle.

. . .

The district court agreed with the Woodards that the statute does not prohibit a party from requiring payment as a condition of acceptance, and found that

6

Grange did not satisfy the Woodards' terms of acceptance through written acceptance alone. The district court also rejected Grange's argument that even if payment was an essential element of acceptance, the insurer had satisfied that provision when it issued settlement checks payable to the Woodards in a timely manner. The district court denied Grange's motion for summary judgment and granted summary judgment to the Woodards.

Grange appealed to the Eleventh Circuit, which concluded that OCGA § 9-11-67.1 was "arguably ambiguous with respect to its requirements." Grange Mut. Cas. Co. v. Woodard, 826 F3d 1289, 1300 (11th Cir. 2016). On the one hand, the court observed, the statute appears to contemplate that an offeree will accept an offer in writing, such that payment would be a term of contract performance, not contract formation. Id. On the other hand, the court continued, subsection (c) arguably permits the parties to reach an agreement as they see fit, including "by contracting around" the procedure set forth in subsections (a) and (b). Id. Noting there were no published state or federal court decisions interpreting OCGA § 9-11-67.1, id. at 1299, the Eleventh Circuit certified the following questions to this Court:

(1) Under Georgia law and the facts of this case, did the parties enter a

binding settlement agreement when the insurer Grange accepted the Woodards'
offer in writing?

(2) Under Georgia law, does OCGA § 9-11-67.1 permit unilateral
contracts whereby offerors may demand acceptance in the form of performance
before there is a binding, enforceable settlement contract?

(3) Under Georgia law and the facts of this case, did OCGA § 9-11-67.1
permit the Woodards to demand timely payment as a condition of accepting
their offer?

(4) Under Georgia law and the facts of this case, if there was a binding
settlement agreement, did the insurer Grange breach that agreement as to
payment, and what is the remedy under Georgia law? Id. at 1300-1301.

2.    *Analysis*

A.    *Background principles of law*

The Eleventh Circuit's certified questions call on us to interpret key
provisions of OCGA § 9-11-67.1.[1]

---

[1] In addition to the parties' briefs and presentations at oral argument, the Court was assisted in its task by helpful amicus briefs from the Georgia Defense Lawyers Association, which filed a brief with the Eleventh Circuit in this case, and the Georgia Trial Lawyers Association.

8

When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. . . . [I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end.

Deal v. Coleman, 294 Ga. 170, 172-73 (1) (a) (751 SE2d 337) (2013) (citations and punctuation omitted). Additionally, "[a]ll statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it. They are therefore to be construed in connection and in harmony with the existing law[.]" Botts v. Southeastern Pipe-Line Co., 190 Ga. 689, 700-01 (10 SE2d 375) (1940) (citation and punctuation omitted). This principle is critical to our understanding of the statute.

In enacting OCGA § 9-11-67.1, the General Assembly acted against the backdrop of a large body of law on contract formation generally and settlement formation specifically. As part of that existing law, "settlement agreements must meet the same requirements of formation and enforceability as other contracts." Torres v. Elkin, 317 Ga. App. 135, 141 (2) (730 SE2d 518) (2012). There is no enforceable settlement between parties absent mutual agreement

9

between them. Id. To that end,

> an answer to an offer will not amount to an acceptance, so as to result in a contract, unless it is unconditional and identical with the terms of the offer. To constitute a contract, the offer must be accepted unequivocally and without variance of any sort. A purported acceptance of a plaintiff's settlement offer which imposes conditions will be construed as a counter-offer to the offer to settle for the policy limits.

Frickey v. Jones, 280 Ga. 573, 574 (630 SE2d 374) (2006) (quoting Herring v. Dunning, 213 Ga. App. 695, 698 (446 SE2d 199) (1994) (citation and punctuation omitted)). These basic contract law principles find their origin in the common law. See 2 William Blackstone, Commentaries on the Laws of England 899 n.19 (William Draper Lewis ed., 1902) ("[A]n implied contract only differs from an express contract in the mode of proof; both equally proceed upon the mutual agreement of the parties, and cannot exist without it."); see also Tucker v. Howard L. Carmichael & Sons, Inc., 208 Ga. 201, 203 (1) (65 SE2d 909) (1951) ("This court regards Blackstone as an authority on the common law.").

Similarly, it is also a fundamental principle of contract law that "an offeror is the master of his or her offer, and free to set the terms thereof." Atkinson v. Cook, 271 Ga. 57, 58 (518 SE2d 413) (1999) (citing Restatement (Second) of

10

Contracts, § 59, cmt. (a) (1981)). This principle also finds its origin in the common law. See Packgen v. Berry Plastics Corp., 973 FSupp.2d 48, 62 (D. Me. 2013) (referring to "(t)he common law idea that the offeror is the master of the offer") (quoting Corbin on Contracts § 3.8 (2013)). An offer ordinarily may contemplate acceptance by the doing of some act, as opposed to a mere oral or written statement of acceptance of certain terms. See Frickey, 280 Ga. at 575 (insurer's response to plaintiff's offer to settle required an additional act necessary to acceptance of the plaintiff's offer — the resolution of all actual and potential liens of health care providers — and thus constituted a counteroffer); Douglas v. Austin-Western Road Mach. Co., 180 Ga. 29, 32 (1) (177 SE 912) (1934) ("An offer may contemplate acceptance by the doing of an act, and if the act be performed while the offer is in life, a binding contract is created, so far as the question of mutuality is concerned."); Kitchens v. Ezell, 315 Ga. App. 444, 447-49 (1) (a) (726 SE2d 461) (2012) (rejecting defendants' argument that presentation of certain bodily injury release was a condition of performance, not acceptance). The concept of a "unilateral contract," whereby an offer calls for acceptance by an act rather than by communication, also has common law origins. See Doss v. Epic Healthcare Mgmt. Co., 901 SW2d 216, 220 (Mo. Ct.

11

App. 1995); see also Friedrich Kessler et al., Contracts: Cases and Materials

370-71 (3d ed. 1986) (quoting Sixth Interim Report of the English Law Revision

Committee 23 (1937)).[2]

B.    *Consideration of OCGA § 9-11-67.1*

"The common-law rules are still of force and effect in this State, except

where they have been changed by express statutory enactment or by necessary

implication." Humphreys v. State, 287 Ga. 63, 70 (4) (694 SE2d 316) (2010)

(citation and punctuation omitted). Considered in this light, we conclude that

the plain language of OCGA § 9-11-67.1 does not expressly or by necessary

---

[2] Although Grange cites Craddock v. Greenhut Constr. Co., 423 F2d 111, 114 (5th Cir. 1970) for the proposition that unilateral contracts are disfavored, that is not to say that they are disallowed. In Craddock, the Fifth Circuit found that the trial court erred in interpreting a contractor's request for furnishment of a performance bond as defining the exclusive means for accepting an offer, as opposed to establishing a condition subsequent modifying the contractor's obligation to award a subcontract. Id. at 114. The appellate court relied in part on the premise that unclear language must be resolved against the draftsman or the party for whose benefit the term is inserted, and the court noted that the contractor "had the power and the ability to clearly require that its offer must be accepted by the act of furnishing the bond." Id. In Jackson Elec. Membership Corp. v. Ga. Power Co., 257 Ga. 772 (364 SE2d 556) (1988), cited by Grange regarding the favored status of bilateral contracts, this Court rejected a trial court's finding that a contract between an electric membership corporation and a hotel company failed due to lack of mutuality of obligation in that the hotel failed to apply for membership in the EMC; we found that the membership application was a mere formality and not a condition precedent to the formation of a contract. Id. at 774 (1). Although we spoke of the "vital purpose" of bilateral contracts, we did not say that unilateral contracts were impermissible. Id.

12

implication contravene these common law principles. Specifically, we cannot conclude that the statute displaced these common law principles by precluding Pre-Suit Offers from requiring terms in addition to those set forth in subsection (a), including requiring prompt payment as a condition of acceptance. Rather, subsection (a) merely sets forth five terms that, at a minimum, must be included in every Pre-Suit Offer. This is so for several reasons.

First, subsection (a) provides that a Pre-Suit Offer "shall . . . contain the following [five] material terms." Although "contain" may sometimes be a term of exclusivity, it also has non-exclusive meanings. See, e.g., *Webster's II New College Dictionary*, 249 (3d ed. 2005) (defining "contain" variously as "[t]o have within" and "[t]o have as component parts"). Although these different definitions create some ambiguity in the abstract, in considering how a word is used in a statute, "we must view the statutory text in the context in which it appears[.]" Deal, 294 Ga. at 172 (1) (a) (citation omitted). And the Georgia Code contains[3] many examples of statutes that use the word "contain" in a context that clearly demonstrates that term is being used in a non-exclusive

---

[3] Yet another example of "contain" being used non-exclusively.

sense. See, e.g., OCGA § 12-5-27.1 (declaring unlawful the retail sale or use of "any cleaning agent containing phosphorus," subject to exceptions such as products that "[c]ontain phosphorus in an amount not exceeding 0.5 percent by weight which is incidental to manufacturing"); OCGA § 9-3-30.1 (reviving or extending statute of limitations for certain actions against manufacturers and suppliers of "asbestos or material containing asbestos"); OCGA § 26-2-378 (requiring restaurants' disclosure of "meat products" that "contain extenders" such as textured vegetable protein, while providing that Code section does not apply to serving of meat products that "do not contain such an amount of extenders" as to require additional labeling in accordance with other laws). And here, part of the context of OCGA § 9-11-67.1 is the common law of contracts discussed above. Subsection (a) does not expressly limit Pre-Suit Offers to allow only the five terms listed therein; it reasonably can be read to require merely that every Pre-Suit Offer include, at a minimum, those five terms. Given that under the common law an offeror is free to set the terms of his of her offer, we read subsection (a) in this fashion, in harmony with the existing law: every Pre-Suit Offer must contain the five enumerated terms, but additional terms are not prohibited.

Subsection (g) bolsters this reading. It provides, "Nothing in this Code section shall prohibit a party making an offer to settle from requiring payment within a specified period; provided, however, that such period shall be not less than ten days after the written acceptance of the offer to settle." This shows that prompt payment may be a term of settlement in a Pre-Suit Offer, as long as the offeror gives the recipient of the offer at least ten days from the time of written acceptance to make the payment. And, because prompt payment is not one of the terms listed in subsection (a), subsection (g) demonstrates that, as a more general matter, a Pre-Suit Offer may include terms other than those listed in subsection (a).

Additionally, subsection (c) provides, "Nothing in this Code section is intended to prohibit parties from reaching a settlement agreement in a manner and under terms otherwise agreeable to the parties." Given the mandatory language of subsection (a) specifying terms that "shall" be included in a Pre-Suit Offer, the most natural reading of this provision is that the statute does not preclude a Pre-Suit Offer from requiring acceptance of terms in addition to those set forth in subsection (a). And the use of the word "manner" in subsection (c) indicates that not only are additional "terms" permissible, but a claimant may

15

ask the recipient of a Pre-Suit Offer to do something to accept the offer beyond stating the recipient's acceptance in writing.

Emphasizing the language of subsection (b), Grange argues that the statute plainly provides that if a Pre-Suit Offer contains the five terms listed in subsection (a), and those five terms are accepted unequivocally, without alteration, and in writing, then a settlement is created (at least where the demand is made pursuant to the statute explicitly). Subsection (b) provides that a recipient of "an offer to settle made under this Code section may accept the same by providing written acceptance of the material terms outlined in subsection (a) of this Code section in their entirety." We agree that this language means that a Pre-Suit Offer must be accepted in writing, at least as to the five terms listed in subsection (a). We do not agree that this language means that a Pre-Suit Offer cannot also require some additional act to effectuate acceptance, however. As set forth above, the common law is well established that (1) the offeror is the master of his or her offer, and (2) agreement requires a meeting of the minds on all material terms. Reading the statute consistent with those principles, we do not equate the phrase "written acceptance" with necessarily effectuating a binding settlement, as the dissent does. Rather, written acceptance of Pre-Suit

16

Offers is necessary to effectuate a binding settlement, but whether it is sufficient depends on the offer; if the recipient of a Pre-Suit Offer is asked to do something more to accept, the parties do not have a meeting of the minds if the recipient does not also perform that action. Subsection (b) does not explicitly forbid a Pre-Suit Offer from requiring an additional action to accept the offer. It thus does not expressly contravene those common law principles.

The statute, including subsection (b), does not contravene those principles by necessary implication, either. Grange argues that to allow one making a Pre-Suit Offer to demand terms other than those set forth in subsection (a) or to require means of acceptance in addition to written acceptance would render the statute meaningless, particularly robbing subsections (a) and (b) of any force or effect. It is true that "a legislative body should always be presumed to mean something by the passage of an act, and an act should not be so construed as to render it absolutely meaningless[.]" Scott v. Mayor & Council of Mt. Airy, 186 Ga. 652, 653-54 (2) (198 SE 693) (1938) (citations and punctuation omitted). But our interpretation does not leave the statute without meaning.

In understanding the work that OCGA § 9-11-67.1 performs, it is helpful to recall the legal environment in which it was enacted. Our 1992 decision on

17

an insurer's duty to its insured when faced with a settlement demand, <u>Southern Gen. Ins. Co. v. Holt</u>, 262 Ga. 267, 268 (1) (416 SE2d 274) (1992),[4] spawned much litigation over, among other things, what constitutes an offer to which an insurer must respond,[5] when an insurer's inquiry about medical liens amounts to a counteroffer,[6] and how much time an offeror must provide for a response in order to trigger an insurer's duty to respond.[7] OCGA § 9-11-67.1 speaks to

---

[4] Although this case does not call on us to consider whether Grange acted in bad faith, Georgia case law on insurers' duties to their insured, specifically our decision in <u>Holt</u>, looms in the background. Therein we held that a trial court properly put to a jury the question of an insurer's bad faith where the insurer refused to settle a plaintiff's claim for policy limits within the time frame set by plaintiff's counsel where liability was clear and the plaintiff's medical bills and lost wages exceeded the policy limits. <u>Holt</u>, 262 Ga. at 269 (1). Regarding the boundaries of an insurance company's duty to settle, we said that "[a]n insurance company does not act in bad faith solely because it fails to accept a settlement offer within the deadline set by the injured person's attorney[,]" but we rejected the insurer's argument that an insurer has no duty to its insured to respond to a deadline on a policy limits settlement demand even "<u>when the company has knowledge of clear liability and special damages exceeding the policy limits</u>." Id. (emphasis in original).

[5] See <u>Baker v. Huff</u>, 323 Ga. App. 357, 365 (1) (a) (747 SE2d 1) (2013) (letter offering to accept policy limits for pain and suffering damages only was not an offer to fully settle a claim within policy limits to which insurer had a duty to respond).

[6] See <u>McReynolds v. Krebs</u>, 290 Ga. 850, 853-54 (2) (725 SE2d 584) (2012) (invitation to discuss how liens will be resolved as part of the settlement was counteroffer); <u>Torres</u>, 317 Ga. App. at 142-43 (2) (insurer's emphasis on its "trust that [plaintiff's counsel's] office will satisfy any liens arising out of this matter" made purported acceptance of settlement demand a counteroffer).

[7] See <u>Holt</u>, 262 Ga. at 269 (1) ("Nothing in this decision is intended to lay down a rule of law that would mean that a plaintiff's attorney under similar circumstances could 'set up' an insurer for an excess judgment merely by offering to settle within the policy limits and by

18

those issues. In subsection (a), OCGA § 9-11-67.1 sets forth certain terms that, at a minimum, must be included in a Pre-Suit Offer, and, in subsection (b), sets forth how those terms must be accepted. OCGA § 9-11-67.1 provides in subsection (d) that the recipient of a Pre-Suit Offer may seek "reasonable clarification" on the topic of liens and other terms without transforming what would otherwise be an acceptance into a counteroffer. In subsections (a) (1) and (g), OCGA § 9-11-67.1 sets minimum time frames that a Pre-Suit Offer must allow for acceptance and payment, respectively, cabining a claimant's ability to "set up" an insurer for a bad faith claim with unreasonably short deadlines. Far from rendering subsection (g) "meaningless," as the dissent argues, our reading of subsection (g) does prevent plaintiffs from presenting settlement offers with "impossible deadlines." Indeed, the insurance company that is a party to this

---

imposing an unreasonably short time within which the offer would remain open.") (citation omitted); Southern Gen. Ins. Co. v. Wellstar Health Sys., Inc., 315 Ga. App. 26, 31 (1) (726 SE2d 488) (2012) (questioning whether demand was sufficient to invoke duty to respond under Holt given its five-day time limit and a lack of documentation to show that special damages exceeded policy limits); Whiteside v. Infinity Cas. Ins. Co., No. 4:07-CV-87, 2008 U.S. Dist. LEXIS 60512, *38-39, 2008 WL 3456508, *12 (M.D. Ga. Aug. 8, 2008) (denying both parties' motions for summary judgment as to claim that insurer acted in bad faith in failing to respond to demand letter within six-day time limit, with deadline falling on a national holiday, given that the demand letter was not plaintiff's counsel's only effort to settle the matter).

case purported to comply with the ten-day payment deadline provided by the Woodards — and apparently would have complied but for an administrative error. Under our reading, the statute effectuates real and meaningful changes to, or at least helpful clarifications of, the existing law.[8]

Grange suggested at oral argument that, as long as the claimant "invokes" OCGA § 9-11-67.1 in making his or her offer, the claimant is not entitled to make a "non-conforming offer," i.e., one that has terms additional to those set forth in subsection (a).[9] We disagree. Nothing in the text of the statute supports a reading that OCGA § 9-11-67.1 applies only to some Pre-Suit Offers. Although the statute refers to "an offer to settle made under this Code section[,]"

---

[8] The dissent suggests that our reading of the statute is wrong because it undermines the General Assembly's goal in passing OCGA § 9-11-67.1 — that is, to reduce bad faith claims. As explained above, the statute indeed limits claimants' ability to present settlement offers with short deadlines. However, it says nothing about bad faith claims. And we may not add meaning to a statute to further what we perceive to have been the General Assembly's policy goals in enacting the legislation. That a statute does not fully solve a problem that we perceive it to address does not mean we misread the statute; rather, it may mean only that the General Assembly struck a delicate balance in addressing controversial issues. We are bound to construe the statute as it is written. "A statute draws its meaning . . . from its text." Chan v. Ellis, 296 Ga. 838, 839 (1) (770 SE2d 851) (2015); see also Turner v. Ga. River Network, 297 Ga. 306, 309 n.5 (773 SE2d 706) (2015) ("There is no basis for the courts to extrapolate the application [of a statute] beyond its literal terms" in an effort to further the perceived policy goals of the General Assembly.).

[9] Grange also suggested that an insurer's response to such an offer could not be the basis for a bad faith claim. We express no opinion here as to the implications for bad faith claims our construction of the statute may have.

20

the language of subsection (a) is mandatory ("any offer . . . shall be in writing and contain the following material terms . . ."). This demonstrates that the references to offers made pursuant to the Code section is a shorthand for the sorts of offers to which the statute applies, as set forth in subsection (a) — pre-suit offers made to settle claims for personal injury arising from the use of a motor vehicle, prepared by or with the assistance of an attorney on behalf of a claimant. And our reading of subsection (a) defeats Grange's definition of "non-conforming" — merely adding terms does not take the offer beyond subsection (a)'s scope.

3.    *Response to certified questions*

For the foregoing reasons, we answer Question (2) in the affirmative. Yes, OCGA § 9-11-67.1 permits "unilateral" contracts whereby Pre-Suit Offers may demand acceptance in the form of performance (in addition to the statutorily mandated written acceptance) before there is a binding enforceable settlement contract. And, with respect to the general issue of law behind Question (3) (although we decline to consider it in the context of the facts of this case), we conclude that OCGA § 9-11-67.1 does not preclude a Pre-Suit Offer from demanding timely payment as a condition of acceptance. However, we

21

respectfully decline to answer the Eleventh Circuit's questions to the extent that they call us to decide the ultimate issues in the case, i.e., Question (1), which asks whether the parties entered into a binding settlement agreement, and Question (4), which asks about the consequences if the parties did reach an agreement. See PNC Bank, Natl. Assn. v. Smith, 298 Ga. 818, 819 n.4 (785 SE2d 505) (2016) ("We do not reach the merits of the underlying case; instead, we answer the questions posed to us only in a general sense, not as applied to the specific facts and circumstances of this ongoing litigation in federal court.").

Certified questions answered in part. All the Justices concur, except Melton, P. J., and Blackwell, J., who dissent.

MELTON, Presiding Justice, dissenting.

Because the plain language of OCGA § 9-11-67.1 (g) prohibits a claimant from conditioning acceptance of a Pre-Suit Offer upon the making of a timely payment, I must respectfully dissent from the majority's erroneous decision concluding otherwise.

22

Pursuant to OCGA § 9-11-67.1 (g):

> Nothing in this Code section shall prohibit a party making an offer to settle from requiring payment within a specified period; provided, however, that such period shall be not less than ten days *after the written acceptance of the offer to settle*.

(Emphasis supplied.)

In interpreting this Code section, "we apply the fundamental rules of statutory construction that require us to construe [the] statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage." (Citations omitted.) Slakman v. Continental Cas. Co., 277 Ga. 189, 191 (587 SE2d 24) (2003). In this regard, "we must presume that the General Assembly meant what it said and said what it meant." Deal v. Coleman, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (citation and punctuation omitted). We must also seek to effectuate the intent of the legislature. OCGA § 1-3-1 (a). In doing so, we must keep in mind that, while "[t]he common and customary usages of the words [in a statute] are important . . . so is their context." (Citations omitted.) Chan v. Ellis, 296 Ga. 838, 839 (1) (770 SE2d 851) (2015). To find such context, a court "construing language in any one part of a statute . . . should consider the entire scheme of the statute and attempt to gather the legislative intent from the statute as a whole."

(Citation omitted.) <u>Sikes v. State</u>, 268 Ga. 19, 21 (2) (485 SE2d 206) (1997).

Bearing these principles in mind, a straightforward reading of OCGA § 9-11-67.1 (g) reveals that the General Assembly intended to separate the payment component of an already formed settlement agreement from the acceptance of an offer that creates an enforceable settlement agreement in the first instance. Indeed, a party making an offer to settle may only "requir[e] payment within a specified period [of not less than ten days] *after* the written acceptance of the offer to settle" has already taken place. The statute does not contemplate that the payment requirement can be a "condition precedent to" or a "contemporaneous" requirement for the acceptance of a settlement offer, but specifically segregates payment, which can only be required and enforced "after" a conforming settlement offer is accepted, from the conforming offer itself. In this regard, it cannot be said that the common law cited by the majority, and that runs contrary to the plain meaning of the statute indicated here with respect to Pre-Suit Offers, has not been "changed by [the] express statutory enactment [of OCGA § 9-11-67.1 (g)] or by necessary implication." (Citation and punctuation omitted.) <u>Humphreys v. State</u>, 287 Ga. 63, 70 (4) (694 SE2d 316) (2010).

In short, OCGA § 9-11-67.1 (g)  creates a two-step process with respect to settlement agreements in the specific circumstances covered by the statute: step one is to create an enforceable settlement agreement through a conforming Pre-Suit Offer and the acceptance of that offer; and step two allows a claimant to require payment on the now binding settlement agreement within a time frame of no less than ten days.

Although other parts of OCGA § 9-11-67.1 allow for a claimant to insert additional terms into a Pre-Suit Offer beyond the minimum requirements of OCGA § 9-11-67.1 (a) (see OCGA § 9-11-67.1 (c)), those other parts of the statute must be read in harmony with OCGA § 9-11-67.1 (g). In this regard, if a party inserts additional terms into a Pre-Suit Offer that run contrary to the acceptable parameters created by OCGA § 9-11-67.1 (g), it cannot be said that the Pre-Suit Offer has been made in conformity with the requirements of OCGA § 9-11-67.1 as a whole.  OCGA  § 9-11-67.1 (c) provides:

> Nothing in this Code section is intended to prohibit parties from reaching a settlement agreement in a manner and under terms otherwise agreeable to the parties.

In order for subsection (g) of OCGA § 9-11-67.1 to have any meaning at all, subsection (c) can only mean that parties may reach a settlement agreement "in

3

a manner and under terms otherwise agreeable to the parties" as long as those terms do not run afoul of the requirement of OCGA § 9-11-67.1 (g) that an enforceable settlement agreement must first be reached before a claimant can enforce a demand for payment within a period of not less than ten days. To interpret OCGA § 9-11-67.1 (c) as allowing for a claimant to condition "acceptance" of a Pre-Suit Offer on the payment of the settlement itself, as the majority has, is to render OCGA § 9-11-67.1 (g) meaningless and undermine the plain meaning of the statutory scheme as crafted by the Legislature.

In this connection, the majority's reliance on the parties' freedom to contract in any manner that they please and an offeror's status as the master of his or her offer is misleading. Insofar as tort claims and offers to settle "arising from the use of a motor vehicle and prepared by or with the assistance of an attorney on behalf of a claimant or claimants" are concerned (OCGA § 9-11-67.1 (a)), an offeror is only the master of his or her offer to the extent permitted by OCGA § 9-11-67.1. In this specific context of Pre-Suit Offers, OCGA § 9-11-67.1 has expressly set forth the parameters within which pre-suit settlement offers must exist now and in the future, and a party may not ignore those parameters in creating a Pre-Suit Offer while purporting to comply with the

4

statute at the same time.

Indeed, as the Eleventh Circuit noted in this case:

> It has been posited that the General Assembly's goal in passing § 9-11-67.1 was to address the negative effects of [case law] . . . [that had been] enabling plaintiffs to present settlement offers with impossible deadlines and expose the insurance company to potential "bad faith" claims when it is unable or unwilling to abide. In enacting § 9-11-67.1, the General Assembly reportedly sought to reduce bad-faith claims by giving insurance companies adequate time to investigate claims and offers before having to decide whether to settle. The Act was arguably meant to be a compromise between the plaintiff and defense bars and to reduce procedural quibbling over the technical sufficiency of a settlement offer.

(Citations and punctuation omitted.) Grange Mut. Cas. Co. v. Woodard, 826 F3d 1289, 1299-1300 (III) (D) (11th Cir. 2016).

Here, the plaintiffs' Pre-Suit Offer did not conform with the requirements of OCGA § 9-11-67.1 due to the addition of terms that conditioned acceptance of the offer on payment, which violated the plain terms of OCGA § 9-11-67.1 (g). However, by allowing plaintiffs to make payment on a non-conforming Pre-Suit Offer a condition precedent to the "acceptance" of that offer based on an erroneous interpretation of the statute, the majority has re-opened the door for "plaintiffs to present settlement offers with impossible deadlines [that] expose the insurance company to potential 'bad faith' claims" (Grange, 826 F3d at 1299-

5

1300)even where, as here, the insurance company accepted the non-conforming Pre-Suit Offer in its written response and sought to secure prompt payment. Because the legislature has made clear that it wished to close that door, and because re-opening it runs directly contrary to the plain language of OCGA § 9-11-67.1 and the intent of the legislature, I must respectfully dissent from the majority.

I am authorized to state that Justice Blackwell joins in this dissent.


Decided March 6, 2017 – Reconsideration denied March 30, 2017.

Certified question from the United States Court of Appeals for the Eleventh Circuit.

Martin Snow, Thomas P. Allen III, William J. Davis, for appellant.

Slappey & Sadd, James N. Sadd, Richard E. Dolder, Jr., for appellees.

Gray, Rust, St. Amand, Moffett & Brieske, Matthew G. Moffett; Hawkins Parnell Thackston & Young, Martin A. Levinson; Drew Eckl & Farnham, Garret W. Meader; Swope Rodante, Darrell W. Hinson, amici curiae.


6