**SECOND DIVISION**
**MILLER, P. J.,**
**ANDREWS and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 27, 2018**

# In the Court of Appeals of Georgia

A18A0649. THE TURFGRASS GROUP, INC. v. GEORGIA COLD
STORAGE CO.

BROWN, Judge.

The Turfgrass Group, Inc. appeals from the trial court's order granting summary judgment in favor of Georgia Cold Storage Co., as well as the trial court's earlier order denying partial summary judgment in its favor on the applicability of these same contract terms. Turfgrass asserts that the trial court erred by concluding that it is bound by the contractual terms and conditions listed on the reverse side of Cold Storage's warehouse receipts. For the reasons explained below, we reverse the trial court's grant of summary judgment to Cold Storage and affirm its denial of Turfgrass's motion for partial summary judgment.

"On appeal, we review the grant or denial of summary judgment de novo, construing the evidence and all inferences in a light most favorable to the nonmoving party." (Citation and punctuation omitted.) *Seki v. Groupon, Inc.*, 333 Ga. App. 319 (775 SE2d 776) (2015). So viewed, the record shows that beginning in June 2006, Turfgrass began storing its excess seed in a temperature-controlled Cold Storage warehouse. It subsequently stored additional seed in June 2007, July 2008, August 2008, and June 2009. The parties did not enter into a written and signed storage agreement.

In June 2010, Turfgrass discovered that some of its stored seed was damaged by rodents and water. It notified Cold Storage about the problem by telephone. Turfgrass did not take any "serious activity" in connection with the loss "for some period of time" because one of its principals assumed "a very legitimate long-term big company" like Cold Storage would "take care of it" and make it "right."

After Cold Storage was unresponsive to Turfgrass's attempts to resolve its complaint, Turfgrass sent an invoice in the amount of $9,625 to Cold Storage for the damaged seed on December 29, 2010. On January 4, 2011, Cold Storage sent Turfgrass a check for $275 based upon a stipulated damage amount of $.50 per pound

for damaged product contained in the "Contract Terms and Conditions" printed on the *reverse* side of its warehouse receipt. This form states:

> SECTION 10 - NOTICE OF CLAIM AND FILING OF SUIT
> (a) COMPANY shall not be liable for any claim of any type whatsoever for loss and/or destruction of and/or damage to GOODS unless such claim is presented, in writing, within a reasonable time, not exceeding 60 days after STORER learns or, in the exercise of reasonable care, should have learned of such loss, destruction and/or damage.
> (b) As a condition precedent to making any claim and/or filing any suit, STORER shall provide COMPANY with a reasonable opportunity to inspect the GOODS which are the basis of STORER'S claim.
> (c) NO LAWSUIT OR OTHER ACTION MAY BE MAINTAINED BY STORER OR OTHERS AGAINST COMPANY WITH RESPECT TO THE GOODS UNLESS A TIMELY WRITTEN CLAIM HAS BEEN MADE AS PROVIDED IN PARAGRAPH (a) OF THIS SECTION AND UNLESS STORER HAS PROVIDED WAREHOUSEMAN WITH A REASONABLE OPPORTUNITY TO INSPECT THE GOODS AS PROVIDED IN PARAGRAPH (b) OF THIS SECTION AND UNLESS SUCH LAWSUIT OR OTHER ACTION IS COMMENCED WITHIN NINE (9) MONTHS AFTER STORER LEARNS OR, IN THE EXERCI[S]E OF REASONABLE CARE, SHOULD HAVE LEARNED OF THE LOSS AND/OR DESTRUCTION OF AND/OR DAMAGE TO THE GOODS.

A principal of Turfgrass admitted receiving the January 4, 2011 letter, including the check and the attached "contract terms and conditions." He stated that this was the first time he learned of such "terms and conditions" and denied that Turfgrass "ever enter[ed] into a contract based on terms and conditions in this document that our seed would not be protected in cold storage." He testified that he

3

had "a little bit of a reaction to it when [he] saw it" and described the $275 check as a "disgustingly small" response to their claim for damages. Turfgrass did not cash the check. Cold Storage's office manager, Wanda Hingle, averred in an affidavit that Turfgrass "acknowledged receipt of, and responded to" the January 4, 2011 letter. She did not explain the nature of Turfgrass's response to the letter, and the record contains no further information about it.

In January or February 2011, Cold Storage began having repeated cooling issues in a portion of its warehouse where Turfgrass's seed was stored. In May 2011, Turfgrass's farm manager went to Cold Storage to retrieve seed for a customer and discovered that seed bags had been damaged by water and rodents. He registered another complaint at Cold Storage's office, telling them "this was totally unacceptable" and that Turfgrass would need help to sort the seed and rebag it. A Cold Storage supervisor "came in and looked at" the damaged seed. Based upon this second incident of damaged seed, Turfgrass inspected more of its stored seed and found that some of it was "just in terrible shape." On May 19, 2011, Turfgrass removed all of its seed from Cold Storage's warehouse.

On July 5, 2013, Turfgrass filed a complaint against Cold Storage, asserting that Cold Storage had improperly stored its seed, resulting in damages "in the

4

principal amount of $492,902." In its answer, Cold Storage asserted that Turfgrass's claims were barred based upon its failure to comply with the contractual period of limitation and conditions precedent listed on the back page of its warehouse receipt form.

With regard to Turfgrass's notice of or assent to the terms and conditions of the warehouse receipts, the record shows that its farm manager and principal testified that they never saw or received the warehouse receipts and that a search of Turfgrass records did not reveal any warehouse receipts. They claim that Turfgrass did not learn of the purported existence of the warehouse receipts until after they received the January 4, 2011 letter from Cold Storage. At that point in time, the last deposit of stored seed had taken place one and a half years earlier.

According to an invoicing clerk employed by Cold Storage, Donna Whitman, Cold Storage's normal business practice was to complete a warehouse receipt and mail it to the customer either the same "day that shipments are received or the next business day." Whitman testified in her deposition that receiving clerks were responsible for preparing the warehouse receipts and mailing them by ordinary mail to the customer. Cold Storage presented no evidence from the particular receiving clerk who prepared the warehouse receipts purportedly mailed to Turfgrass between

2006 and 2009. Whitman could not identify who sent the warehouse receipts to Turfgrass in 2006, and identified six different people who acted as the receiving clerk handling warehouse receipts for Cold Storage between 2006 and 2014.

Whitman also averred the following in her affidavit:

Since before 2006 and after 2009,[1] Georgia Cold Storage's business practice with regard to warehouse receipts has been as follows. When a shipment is received by Georgia Cold Storage, information regarding the shipment is entered by a clerk into Georgia Cold Storage's computer system, which generates a warehouse receipt. The warehouse receipt would then be printed in duplicate on special paper, which has the terms and conditions of storage pre-printed on the reverse side of the paper. In 2006, Georgia Cold Storage used Okidata dot matrix printers that printed warehouse receipts on carbon-type paper, simultaneously creating two copies of warehouse receipts, with the terms and conditions on the back of the first page. At some point after that, Georgia Cold Storage transitioned to laser printers, which would print two copies of each warehouse receipt, with the terms and conditions on the back of each page. After the warehouse receipts were printed, one copy of the warehouse receipt would be signed and mailed to the customer via

---

[1] Turfgrass asserts that this language mandates a conclusion that there is "a gap of any proof of what was the procedure between January 1, 2006, and December 31, 2009, – the very period during which Turfgrass shipped product to [Cold Storage]'s warehouse." We disagree. An examination of all of the language in the paragraph, as well as Whitman's deposition testimony, shows that Cold Storage submitted evidence of its general practices from pre-2006 through 2009.

regular first class mail to the customer's billing address. The other copy would be kept for filing by Georgia Cold Storage.

Copies of the warehouse receipts Cold Storage claims it mailed to Turfgrass are attached to Whitman's affidavit. The warehouse receipts for deliveries made in June 2006 and June 2007 contain the following statement at the bottom of the first page: "The goods are stored subject to all the terms and conditions stated in the reverse hereof. Said terms and conditions constitute a contract to which customer agrees by the acceptance of this Warehouse Receipt." Immediately underneath the statement are the words "GEORGIA COLD STORAGE CO." in bold, and underneath these words the following signature line appears: "By: _____." The signature line on these warehouse receipts is blank. Based upon the amount of spacing between the words Georgia Cold Storage Co. and the signature line, as well as the content of the language appearing immediately above the words Georgia Cold Storage Co., it is unclear whether the document called for the bailor or the bailee to sign in the space provided.

Warehouse receipts for deliveries made in July 2008, August 2008, and June 2009 have no signature line on the front page. Very small print appears at the bottom of the *front* page of the warehouse receipt which states: "Terms:" followed by a large

amount of space to the right of the word. In the center of the page on the same line, the form then states in the same small print: "This contract contains a limitation of liability," followed by approximately five blank spaces before the words "Refer to terms and conditions on file or attached." These words were set in a much smaller font than the rest of the document and were not in bold.

Cold Storage asserts that Turfgrass received additional notice of these terms and conditions in June 2009. Hingle averred that on June 12, 2009, she mailed a letter to all of Cold Storage's customers, including Turfgrass, reminding them of the terms and conditions of the warehouse receipts. She asserts that she mistakenly dated the printed letter for June 12, 2002, instead of June 12, 2009, and that no similar letter was mailed on June 12, 2002. Hingle handwrote the date 2009 beside the typewritten date on the letter attached to her affidavit. Turfgrass denies receiving this letter, and asserted in its discovery responses that this letter was fabricated by Cold Storage.

Turfgrass moved for partial summary judgment in its favor on the applicability of Cold Storage's contractual defenses derived from the preprinted terms on the reverse side of its warehouse receipts. The trial court denied the motion based upon its conclusion that issues of fact existed with regard to Turfgrass's receipt of the warehouse receipts. Five months later, Cold Storage moved for summary judgment

8

in its favor based upon the same language and additional discovery materials filed with the trial court. Based upon a Uniform Commercial Code provision regarding warehouse receipts, OCGA § 11-7-201, the trial court concluded as a matter of law that Turfgrass did not need to receive the warehouse receipt in order for its terms to be enforceable. In its view, evidence that Cold Storage routinely mailed the warehouse receipts demonstrated that they were "issued" within the meaning of OCGA § 11-7-201 and the listed conditions on the reverse side were therefore binding against Turfgrass as a matter of law. Based upon this finding, the trial court concluded that Turfgrass's complaint was barred by its failure "to provide written notice of its claim within sixty days and institute legal action within ninety days of discovery of damages to its product . . ."[2]

In our view, the trial court erred in its legal analysis by focusing solely upon whether the warehouse receipts were "issued" under Article 7 of Georgia's Commercial Code. OCGA § 11-7-101 states that Article 7 "shall be known and may

---

[2] The trial court did not analyze whether these provisions regarding "the time and manner of presenting claims and instituting actions based on bailment" were reasonable. OCGA § 11-7-204 (c). See *Metropolitan Life Ins. Co. v. Caudle*, 122 Ga. 608, 609 (50 SE 337) (1905) ("[a] party may contract that the time for bringing an action shall be limited, and if such time is reasonable, he will be bound by his contract.").

9

be cited as [the] "Uniform Commercial Code – Documents of Title." Our Code defines a "[d]ocument of title" to include a

> warehouse receipt . . . and any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold, and dispose of the document and the goods it covers. To be a document of title, a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

OCGA § 11-1-201 (b) (16). Accordingly, an issued warehouse receipt is merely a document of title that under certain specified circumstances can become "negotiable." OCGA § 11-7-104 (a). In the absence of these circumstances, the warehouse receipt is "nonnegotiable." OCGA § 11-7-104 (b). Article 7 also provides that any "warehouse," defined as "a person engaged in the business of storing goods for hire," OCGA § 11-7-102 (a) (13), may issue a warehouse receipt. OCGA § 11-7-201 (a). It provides for "a lien against the bailor on the goods covered by a warehouse receipt," OCGA § 11-7-209 (a), and the methods a warehouse may use to enforce the lien. OCGA § 11-7-210. Finally, it provides a circumstance under which title under a warehouse receipt may be defeated. OCGA § 11-7-205.

Significantly, it defines a "[b]ailee" as the "person that by a warehouse receipt, bill of lading, or other document of title acknowledges possession of goods and contracts to deliver them." OCGA § 11-7-102 (a) (1). Article 7 states that a warehouse receipt "may" include "[r]easonable provisions as to the time and manner of presenting claims and commencing actions based on the bailment," OCGA § 11-7-204 (c), and "a term . . . limiting the amount of liability in case of loss or damage, and setting forth a specific liability in case of loss or damage." OCGA § 11-7-204 (b). Nothing in Article 7 changes ordinary contract law regarding assent to the terms of a contract. Indeed, OCGA § 11-1-103 expressly provides that "unless 'displaced' by a particular provision of the UCC, other law supplements the law of the UCC." *Gwinnett Community Bank v. Arlington Capital*, 326 Ga. App. 710, 717 (2) (a) (i) (757 SE2d 239) (2014). See also *Ga. Ports Auth. v. Servac Intl.*, 202 Ga. App. 777 (415 SE2d 516) (1992) (recognizing that General Assembly's enactment of Article 7 of the Uniform Commercial Code "did not repeal or affect Georgia bailment law").

In *Birmingham Television Corp. v. Water Works*, 290 S2d 636 (1974), the Alabama Supreme Court addressed whether a bailor like Turfgrass accepted "conditions of bailment set forth on the reverse side of the warehouse receipt." Id. at 640. It concluded that such terms and conditions could become effective only if the

11

bailor could be charged with actual or constructive notice of such terms and conditions. Id. at 642. Based upon issues of fact regarding such notice, it reversed the trial court's grant of summary judgment to the bailee because it could not "say that as a matter of law [the bailor] accepted the terms and conditions on the reverse side of the warehouse receipt as part of the contract of bailment." Id. In a case involving Article 7 of the UCC, the Arizona Court of Appeals also concluded that assent to a limitation of liability in a warehouse receipt is required for the limitation to become a part of the bailment contract. *Lerner v. Brettschneider*, 598 P2d 515, 518 (1979).

The Georgia General Assembly has defined a "bailment" as "a delivery of goods or property *upon a contract, express or implied*, to carry out the execution of a special object beneficial either to the bailor or the bailee or both and to dispose of the property in conformity with the purpose of the trust." (Emphasis supplied.) OCGA § 44-12-40. An essential element for a valid contract is "the assent of the parties to the terms of the contract." OCGA § 13-3-1. "An implied contract only differs from an express contract in the mode of proof; both equally proceed upon the mutual agreement of the parties, and cannot exist without it." (Citation and punctuation omitted.) *Grange Mut. Cas. Co. v. Woodard*, 300 Ga. 848, 853 (2) (a) (797 SE2d 814) (2017). "Express contracts and contracts implied in fact depend upon the will of the

12

parties to be bound, indicated in the one case expressly in some form recognized by law, and in the other by circumstances from which assent may be inferred as a conclusion of fact." *Butts County v. Jackson Banking Co.*, 129 Ga. 801, 808 (60 SE 149) (1908).

While there are no Georgia cases addressing the particular issue before us, it is clear that our law of bailment requires assent to limitations of liability. *American Laundry v. Hall*, 27 Ga. App. 717 (109 SE 676) (1921) ("the mere receipt by the customer of the memorandum containing . . . printed notice does not amount to an agreement and assent to the terms of the notice, and therefore there arises no special contract whereby the customer consents to any limitation of liability"). After considering the UCC provisions governing warehouse receipts and harmonizing them with Georgia's contract and bailment law, we conclude that assent is required for terms and conditions in a warehouse receipt to become effective. See *Birmingham Television*, supra, 290 S2d at 642; *Lerner*, supra, 598 P2d at 518. Accordingly, the trial court erred by concluding that evidence showing that Cold Storage routinely mailed warehouse receipts to its customers was sufficient to bind Turfgrass to the

13

terms and conditions on the reverse side of such receipts as a matter of law.[3] The

proper analysis is whether genuine issues of material fact exist on the issue of assent.

> In determining whether there was a mutual assent, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent. . . . [T]he circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement. Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury. . .

---

[3] The cases upon which Cold Storage relies do not require a different result as they address only whether a warehouse *lien* was created under the UCC. See *In re Celotex Corp.*, 134 BR 993, 997 (M.D. Fla. 1991) (holding that creation of warehouse lien depends upon warehouse receipt, at a minimum, being "mailed or transmitted to the customer/bailor" and that "[t]he [warehouse] receipt is a condition precedent to establishing a lien on the goods in the possession of the warehouse[]"); *In re Knoware, Inc.*, 57 BR 163, 165 (D. Mass. 1986) (holding that "[d]epositing the warehouse receipt in the U.S. mails is at the very least, required to meet the element of issuance"; finding no valid lien because "sole evidence was that the form was deposited in the company's box for outgoing mail"); *Grundey v. Clark Transfer Co.*, 256 SE2d 732, 735 (N.C. App. 1979) (holding that creation of lien rested upon whether warehouse receipt was properly issued, meaning "sen[t] forth" and mailed to the proper address). These decisions do not address whether terms and conditions on a warehouse receipt are effective against the bailor in the event that goods stored by the bailee are damaged.

. [A]ssent may be implied from the circumstances, and the conduct of the parties.

(Citations and punctuation omitted.) *Thomas v. Chance*, 325 Ga. App. 716, 718 (754 SE2d 669) (2014).

The record before us contains no evidence showing that Turfgrass expressly assented to the terms and conditions of the warehouse receipt. While there is evidence showing that the warehouse receipts would have been mailed to Turfgrass in the ordinary course of business, no evidence was presented from the person responsible for actually mailing the warehouse receipts during the relevant time, and Turfgrass denies receiving them in the mail. While evidence of Cold Storage's routine practice might be admissible under OCGA § 24-4-406,[4] a jury must determine whether this routine practice was followed with regard to Turfgrass. See *Pacheco v. United States*, No. C15-1175RSL, 2017 U. S. Dist. LEXIS 25676, at *8-10 (W.D. Wash. February 22, 2017) (holding that genuine issue of fact existed with regard to consent for flu vaccination based upon defendant's habit evidence; court refused to make inferences

---

[4] This Code section provides: "Evidence of . . . the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the organization on a particular occasion was in conformity with such . . . routine practice."

15

about significance of missing consent form and the credibility of witnesses); *Home Ins. Co. v. Kresser Nationwide Truckload Svcs.*, No. 92C1035, 1994 U. S. Dist. LEXIS 16689 at *29-30 (N.D. Ill. November 21, 1994) (district court refused to hold that evidence of routine practice mandated summary judgment in favor of party relying upon it). Accordingly, genuine issues of material fact exist with regard to Turfgrass's receipt of and assent to the terms and conditions of the warehouse receipts that Cold Storage routinely mailed to its customers.[5]

---

[5] Our opinion in *Benedict v. State Farm Bank*, 309 Ga. App. 133 (709 SE2d 314) (2011), does not require a different result. In that case, we acknowledged that "evidence of the customary business practices of an organization is admissible proof that the conduct of an organization on a particular occasion conformed to the practice." Id. at 139 (2). The bank submitted evidence showing a standard practice of mailing a credit card agreement *and* a newly issued credit card in a *single* envelope. Id. We affirmed the trial court's order compelling arbitration because the cardholder's claim that he had no knowledge of the agreement was "contradicted by his own affidavit" and his conduct in activating and using the card provided proof of his acceptance of the terms in the agreement. Id. at 140 (2). In this case, nothing was mailed in a single envelope with the warehouse receipts that, along with Turfgrass's subsequent conduct, could demonstrate receipt, much less acceptance of the terms included on the reverse side of the warehouse receipts.

Decisions addressing cancellations of insurance policies under OCGA § 33-24-44 are also inapposite because this Code section provides that cancellation becomes effective within a certain period of time after the date the notice of cancellation is placed in the mail. See *Burnside v. GEICO General Ins. Co.*, 309 Ga. App. 897, 900-901 (714 SE2d 606) (2011); *Zilka v. State Farm Mut. Auto Ins. Co.*, 291 Ga. App. 665, 667 (2) (662 SE2d 777) (2008).

Turfgrass's undisputed receipt of the terms and conditions in the warehouse receipts, along with a $275 check, in January 2011 likewise fails to demonstrate its assent, or lack thereof, as a matter of law. The record shows that Turfgrass failed to cash the check, and responded to Cold Storage in some fashion. The record before us, however, is silent as to the nature of Turfgrass's response. Without additional information about the nature of this response, we cannot determine the issue of assent as a matter of law.

The misdated June 12, 2002 letter that Cold Storage claims should have been dated 2009, and which Turfgrass denies receiving, also fails to establish assent as a matter of law. Additionally, the June 11, 2009 warehouse receipt supports a finding that Turfgrass made its last delivery of seed *before* the misdated letter was mailed. Compare *Sun Valley v. Southland Bonded Warehouse*, 171 Ga. App. 233 (319 SE2d 91) (1984) (noting that bailor did "not controvert that its actions in tendering to and depositing goods with [bailee] . . . constituted acceptance" of the terms of a written storage agreement even though it was not signed by bailor).

Based upon our conclusion that issues of fact exist with regard to Turfgrass's assent to the terms and conditions in the warehouse receipt, we reverse the trial

17

court's grant of summary judgment to Cold Storage and affirm its denial of Turfgrass's partial motion for summary judgment.

*Judgment affirmed in part and reversed in part. Miller, P. J., and Andrews, J., concur.*