**FIRST DIVISION**
**BARNES, P. J.,**
**MERCIER and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**April 23, 2019**

# In the Court of Appeals of Georgia

A19A0715, A19A0716. YIM et al. v. CARR; and vice versa.

BARNES, Presiding Judge.

These companion appeals arise out of an automobile collision involving Patricia Ann Carr and Jenny Jung Ah Yim ("Yim"). Following the collision, Carr sued Yim for negligence and her parents, Bok and John Yim (collectively, the "parents"), under theories of vicarious liability.[1] Yim thereafter filed a motion to enforce a settlement agreement allegedly entered into by her insurer and Carr, and her parents filed motions for summary judgment on the vicarious liability claims brought against them. After conducting hearings on the motions, the trial court granted Yim's motion to enforce the settlement agreement and denied her parents' motions for

---

[1] Carr also sued the parents for negligent entrustment, but she later voluntarily dismissed that claim.

summary judgment. The trial court granted the parents a certificate of immediate review from the denial of their summary judgment motions, and they filed an application for interlocutory appeal. This Court granted the application, leading to the parents' appeal of the trial court's order denying their motions for summary judgment in Case No. A19A0715. In Case No. A19A0716, Carr cross-appeals from the trial court's order granting Yim's motion to enforce the settlement agreement.

Because the uncontroverted evidence of record shows that Yim's parents could not be held vicariously liable for Yim's alleged negligence under the family purpose doctrine or the doctrine of respondeat superior, we reverse the trial court's denial of the parents' motions for summary judgment in Case No. A19A0715. Because there was no unequivocal acceptance of the settlement offer that Carr made to Yim's insurer, no binding settlement agreement was formed, and we therefore reverse the trial court's grant of Yim's motion to enforce the settlement agreement in Case No. A19A0716.

*Case No. A19A0715*

1. The parents contend that the trial court erred in denying their motions for summary judgment.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). In reviewing the denial of a summary judgment motion, "we owe no deference to the trial court's ruling and we review de novo both the evidence and the trial court's legal conclusions. Moreover, we construe the evidence and all inferences and conclusions arising therefrom most favorably toward the party opposing the motion." (Citations and punctuation omitted.) *Bryant v. Optima Intl.*, 339 Ga. App. 696, 696 (792 SE2d 489) (2016).

> A defendant demonstrates entitlement to summary judgment by showing that the record lacks evidence sufficient to create a jury issue on at least one essential element of the plaintiff's case. The defendant does not need to affirmatively disprove the plaintiff's case, but may prevail simply by pointing to the lack of evidence. If the defendant does so, the plaintiff cannot rest on his pleadings, but must point to specific evidence that gives rise to a triable issue of fact.

(Punctuation and footnote omitted.) *Meadows v. Diverse Power*, 296 Ga. App. 671, 671 (675 SE2d 571) (2009).

Construed in favor of Yim's parents as the non-moving parties, the evidence shows that on the morning of April 14, 2016, Yim and Carr were involved in a two-

car collision on West Paces Ferry Road. At the time, Yim was 28 years old, lived with her parents, and was driving a 2014 Hyundai Sonata that she co-owned with her mother. Yim's mother had co-signed the car note so that Yim could obtain a loan to pay for the vehicle, and the automobile insurance policy was in the names of Yim's parents. Yim gave her father the money for each loan payment, and he would write a check to the lender. Yim also reimbursed her father for the insurance premiums, and she paid for all of the vehicle's gasoline and maintenance. Yim had sole possession of the car keys and did not need her parents' permission to use the car. Her parents never drove the vehicle. They testified that the car belonged to Yim, that she was an adult who made her own decisions, and that they did not control whether she drove it.

Yim worked for her father's cleaning company at a location off of West Paces Ferry Road. However, in her affidavit, Yim averred that at the time of the accident, she was "traveling to do volunteer work of [her] own choosing" and was not acting as an agent of her father. During her deposition, Yim denied that she was on her way to work for her father on the day of the accident, testified that she would search online to find volunteer opportunities with various organizations, and reiterated that she "was going to volunteer" for such an organization when the accident occurred.

4

In an affidavit, Yim's father averred that Yim "was not performing any task or errand for [him]" at the time of the accident. The father testified in his deposition that he had not known where Yim was going that morning and had been asleep when she left the house. During her deposition, Yim's mother denied that Yim had been "going somewhere to do something for [her] husband's company at the time of the crash."

In his motion for summary judgment, Yim's father argued that he had no ownership interest in the car and exercised no control or authority over it, and in her motion for summary judgment, Yim's mother argued that she had no control or authority over the vehicle. Carr opposed the motions, arguing that there were genuine issues of material fact as to whether Yim's parents could be held vicariously liable under the family purpose doctrine and/or the doctrine of respondeat superior. Following a hearing, the trial court denied the parents' motions for summary judgment, stating that there were genuine issues of material fact as to whether they could be held vicariously liable for Yim's alleged negligence based on the family purpose doctrine and the doctrine of respondeat superior.

(a) The parents contend that the uncontroverted evidence of record demonstrates that they cannot be held vicariously liable for Yim's alleged negligence under the family purpose doctrine. We agree.

5

The family purpose doctrine in Georgia provides that every person shall be liable for torts committed by his child by his command or in the prosecution and within the scope of his business, whether the same are committed by negligence or voluntarily. Thus, when an automobile is maintained by the owner for the use and convenience of his family, such owner is liable for the negligence of a member of the family having authority to drive the car while it is being used for a family purpose. To impose vicarious liability under the family purpose doctrine requires a two step process. First, the following four preconditions must be found present: (1) the owner of the vehicle must have given permission to a family member to drive the vehicle; (2) the vehicle's owner must have relinquished control of the vehicle to the family member; (3) the family member must be in the vehicle; and (4) the vehicle must be engaged in a family purpose. Second, and only after the above four necessary preconditions have been satisfied, the doctrine renders the defendant vicariously liable if defendant had the right to exercise such authority and control that it may be concluded that an agency relationship existed between defendant and the family member with respect to the use of the vehicle.

(Punctuation, footnotes, and emphasis omitted.) *Dashtpeyma v. Wade*, 285 Ga. App. 361, 362-363 (2) (646 SE2d 335) (2007).[2] See OCGA § 51-2-2. "[T]he mere fact that

---

[2] "An adult child of the [car] owner may be a 'family member' within the meaning of the family purpose doctrine if the child lives in the parent's household and uses the car for a purpose for which it was provided by the parent." *Harvey v. Taylor*, 193 Ga. App. 172, 174 (387 SE2d 403) (1989).

6

a vehicle is registered in the head of the household's name and driven by a family member does not, by itself, establish that the family purpose doctrine is applicable." (Punctuation omitted.) *Bailey v. Butler*, 199 Ga. App. 753, 754 (406 SE2d 97) (1991). "[T]he principal factor is authority and control of the vehicle, and this is not necessarily determined by title to the vehicle or payment for the expenses of operation. Agency, not ownership, is the test of liability." (Citations and punctuation omitted.) *Walston v. White*, 213 Ga. App. 441, 442 (444 SE2d 855) (1994).

In the present case, pretermitting whether any of the four initial factors are present, we conclude that the family purpose doctrine is not applicable because the uncontroverted evidence shows that Yim's parents did not have the requisite authority and control over her use of the 2014 Hyundai Sonata involved in the automobile collision. It is true that Yim's mother was a joint owner of the vehicle and co-signed the car note, and that the insurance policy on the vehicle was in the parents' names. But, the evidence also undisputedly demonstrates that Yim was employed, that she gave her father the money to make the loan payments, that she reimbursed him for the insurance premiums, and that she paid all of the gasoline and maintenance expenses for the vehicle. Additionally, the uncontroverted evidence reflects that Yim did not have to obtain her parents' permission to drive the car, was the car's only driver, and

7

had sole possession of the keys. Based on the parents' affidavits and deposition testimony, it also is clear that they considered the car to belong to Yim and did not feel that they could deprive her of its use.

In previous decisions involving similar facts, we concluded that the family purpose doctrine did not apply. For example, in *Bailey*, 199 Ga. App. 753, the car's title and insurance were in the mother's name, but the son was financially responsible for the car and was its sole user. Id. at 753. We ruled that "the family purpose doctrine is not applicable because the undisputed evidence established that [the mother] . . . had no right to specify when, how, or for what purpose [her son] used [the car]." Id. at 754. We further noted that "[t]he requisite authority over the vehicle was not established merely because the insurance policy and title to the car were in [the mother's] name." Id. Likewise, in *Walston*, 213 Ga. App. 441, we held that the family purpose doctrine was inapplicable where the father was listed as a joint owner on the car title and co-signed the loan for the car, but his son was financially responsible for the vehicle and was the sole driver, and the father "did not attempt to exercise authority or control over the vehicle." Id. at 442. *Bailey* and *Walston* are factually on point and control the outcome of this case. Accordingly, because the uncontroverted evidence shows that Yim's use of the car was not under her parents' authority and

8

control, the family purpose doctrine is inapplicable, and the trial court erred in concluding otherwise.

In contending that summary judgment was properly denied, Carr asserts that Yim was subject to "house rules" imposed by her parents. However, Carr fails to provide any record citations to support her assertion, and we have found no record evidence to support it. Consequently, the present case is distinguishable from cases where there was some evidence that the parent had authority to restrict, or did in fact restrict, the child's use of the vehicle for violating household rules. See *Tolbert v. Murrell*, 253 Ga. 566, 569 (2) (322 SE2d 487) (1984) (mother "deprived her son of the use of a car at least once as an incentive to do better in school"); *Danforth v. Bulman*, 276 Ga. App. 531, 533 (1) (623 SE2d 732) (2005) (mother expected her son to follow her basic household rules and would have restricted his use of the car if she'd known he was drinking or using drugs).

Carr also cites to *Kirkland v. Crawford*, 136 Ga. App. 388 (221 SE2d 482) (1975), to support her contention that summary judgment was properly denied to Yim's parents. In *Kirkland*, we affirmed the denial of a motion for directed verdict and held that a wife could be held vicariously liable under the family purpose doctrine for an automobile collision caused by her husband. Id. at 389-390. But, *Kirkland* only

9

addressed arguments concerning whether the wife was the owner and provider of the car used by her husband; it did not address the additional step of the family purpose doctrine analysis, i.e., whether the wife exercised authority and control over the vehicle. See id. "Issues merely lurking in the record, neither brought to the court's attention nor expressly ruled upon, have not been decided so as to constitute precedent." (Citation and punctuation omitted.) *Atlantic Specialty Ins. Co. v. Lewis*, 341 Ga. App. 838, 845 (1) (c), n. 4 (802 SE2d 844) (2017). It follows that *Kirkland* is not pertinent to the central question raised in the present appeal regarding whether Yim's parents exercised authority and control over the car.

In any event, *Kirkland* is factually distinguishable. The evidence in that case showed that the title and insurance documents for the car driven by the husband were solely in his wife's name. *Kirkland*, 136 Ga. App. at 388. And, while there was some evidence that the husband paid for the car and its expenses, id. at 389, there also was some evidence that the husband was unemployed, and thus was financially dependent on his wife to supply the vehicle for his use. Id. at 390. In contrast, Yim was listed on the car title as an owner, and the undisputed evidence shows that she was employed and had the financial means to pay for the car. Compare id.; *Watson v. Brown*, 126 Ga. App. 69, 71-72 (189 SE2d 903) (1972) (car driven by granddaughter was titled

10

in grandmother's name, and there was some evidence that the granddaughter, who was a minor enrolled in college, was financially dependent on the grandparents to pay for the car). Because *Kirkland* did not address the question of authority and control and is factually dissimilar in material respects from the present case, it does not control the outcome here.

In sum, the uncontroverted evidence reflects that Yim's parents did not exercise any authority or control over the car. Accordingly, the trial court erred in denying the parents summary judgment on Carr's vicarious liability claim predicated on the family purpose doctrine.

(b) The parents also contend that the trial court erred in denying their motions for summary judgment on the ground that there was evidence to support holding them vicariously liable based on the doctrine of respondeat superior.[3] We agree.

---

[3] Although Carr's complaint did not specifically include a vicarious liability claim against the parents predicated on the doctrine of respondeat superior, Carr argued in her brief responding to the parents' motion for summary judgment and at the hearing on the motion that the parents could be held vicariously liable based on that doctrine. Because the parents did not object to the trial court considering the issue of respondeat superior liability, Carr's complaint was deemed amended to conform to the evidence presented. See *Hamburger v. PFM Capital Mgmt.*, 286 Ga. App. 382, 386 (1) (b) (649 SE2d 779) (2007); *BTL COM v. Vachon*, 278 Ga. App. 256, 259 (2), n. 3 (628 SE2d 690) (2006).

Under the doctrine of respondeat superior, an employer can be held vicariously liable for the negligence of an employee "when the employee is acting within the course and scope of his employment." *Corrugated Replacements v. Johnson*, 340 Ga. App. 364, 366 (1) (b) (797 SE2d 238) (2017). See *Allen Kane's Major Dodge v. Barnes*, 243 Ga. 776, 777 (257 SE2d 186) (1979) ("When a servant causes an injury to another, the test to determine if the master is liable is whether or not the servant was at the time of the injury acting within the scope of his employment and on the business of the master.").

Here, there was evidence that Yim's father was the sole proprietor of a cleaning company and that Yim worked for the company. But, Yim's father did not own the car she was driving when the automobile collision occurred. Furthermore, Yim averred in her affidavit that at the time of the accident, she was "traveling to do volunteer work of [her] own choosing" rather than to her job, and she testified in her deposition that she was on her way to a volunteer organization when the collision happened. Yim's father did not contradict her on this point.

Carr contends, however, that Yim's mother testified in her deposition that Yim was engaged in an activity that advanced the father's cleaning business at the time of the collision, thereby creating a genuine issue of material fact on the issue of

12

respondeat superior liability. Carr's contention is belied by the deposition transcript, when the mother's testimony is read in context. The pertinent portion of the transcript reads:

> Q: Was Jenny doing anything for your husband's company at the time of the crash?
> A: (Through Interpreter) Yes.
> Q: What was she doing?
> A: (Through Interpreter) She was helping out the cleaning work.
> Q: What address was Jenny going to help clean?
> THE INTERPRETER: Can you rephrase the question?
> Q: Sure. . . . Where was Jenny supposed to be going to help out with the cleaning?
> A: (Through Interpreter) She was just helping out a bunch of different things.
> Q: Was she helping a bunch of different people that worked for your husband's company?
> A: (Through Interpreter) No.
> Q: *Now – I'm sorry, I'm confused. Was Jenny going somewhere to do something for your husband's company at the time of the crash?*
> A: (Through Interpreter) *No.*

(Emphasis supplied.) As shown by the mother's deposition testimony, the exchange between Carr's attorney and the mother was translated by an interpreter, which resulted in some confusion over some of those questions and answers. However, Carr's attorney rephrased his question several times to remove any confusion, leading the mother to clarify that, although Yim was employed by her father's cleaning company during the time period of the automobile accident, she was not working

13

within the course and scope of that employment when the accident occurred. Thus, the testimony of Yim's mother was consistent with Yim's affidavit and deposition testimony that she was not engaged in company business at the time of the collision.[4]

For these reasons, we conclude that the uncontroverted evidence of record demonstrates that Yim "was engaged in purely personal activity and was not acting within the course and scope of [her] employment" when the automobile collision with Carr took place. *Corrugated Replacements*, 340 Ga. App. at 367 (1) (b). As such, the

---

[4] Carr argued in the court below that a jury could infer from the fact that Yim was traveling in the area near her job site when the collision occurred that she "was engaged in an activity for her father's sole proprietorship." However, as noted above, Yim's unimpeached affidavit and deposition testimony was that she was on her way to do volunteer work for another organization at the time of the accident, and "before circumstantial evidence can have any probative value to rebut or contradict direct and positive testimony of an unimpeached witness of the alleged facts in question, such evidence must point *at least more strongly* to a conclusion opposite to the direct testimony." (Citation and punctuation omitted; emphasis supplied.) *Callaway v. Quinn*, 347 Ga. App. 325, 328 (819 SE2d 493) (2018). See *Patterson v. Kevon, LLC*, 304 Ga. 232, 236 (818 SE2d 575) (2018) (discussing rules governing circumstantial and direct evidence on summary judgment and noting that "[c]ircumstantial evidence [ ] . . . may be sufficient for a plaintiff's claim to survive summary judgment, if other theories are shown to be *less probable*") (emphasis in original). The fact that Yim was traveling on West Paces Ferry Road when the accident occurred, and her job site was located at another point off of that road, was insufficient, without more, to show that she was engaged in work-related activity when the accident occurred or to rebut the unimpeached, direct testimony that she was on her way to do volunteer work. See id. See also *Cowart v. Widener*, 287 Ga. 622, 633 (3) (c) (697 SE2d 779) (2010) ("Summary judgment cannot be avoided based on speculation or conjecture.").

14

trial court erred in denying the parents' motion for summary judgment on Carr's vicarious liability claim predicated on respondeat superior.

*Case No. A19A0716*

2. Carr contends that the trial court erred in granting Yim's motion to enforce the settlement agreement.

> We apply a de novo standard of review to a trial court's order on a motion to enforce a settlement agreement. Because the issues raised are analogous to those in a motion for summary judgment, in order to succeed on a motion to enforce a settlement agreement, a party must show the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of the Appellant's case. Thus, we view the evidence in a light most favorable to the nonmoving party.

(Citations and punctuation omitted.) *Duenas v. Cook*, 347 Ga. App. 436, 436-437, (818 SE2d 629) (2018).

So viewed, the record reflects that on May 2, 2016, which was prior to the lawsuit filed in this case pertaining to the automobile collision, Carr's attorney sent Yim's insurance carrier, Liberty Mutual General Insurance Company ("Liberty

15

Mutual"), a time-limited settlement offer pursuant to OCGA § 9-11-67.1[5] (the "Settlement Offer"). It provided in relevant part that in exchange for payment of Liberty Mutual's policy limits of $100,000 within 30 days from receipt of the Settlement Offer,[6] Carr would execute the limited liability release that was attached to the Settlement Offer, which would release Yim from Carr's bodily injury claims arising from the automobile collision. The Settlement Offer specifically stated in relevant part:

> JENNY JUNG YIM, and only JENNY JUNG YIM, will be released under the enclosed Limited Liability Release. We are not aware of any

---

[5] OCGA § 9-11-67.1 (a) provides:
Prior to the filing of a civil action, any offer to settle a tort claim for personal injury, bodily injury, or death arising from the use of a motor vehicle and prepared by or with the assistance of an attorney on behalf of a claimant or claimants shall be in writing and contain the following material terms:
(1) The time period within which such offer must be accepted, which shall be not less than 30 days from receipt of the offer;
(2) Amount of monetary payment;
(3) The party or parties the claimant or claimants will release if such offer is accepted;
(4) The type of release, if any, the claimant or claimants will provide to each releasee; and
(5) The claims to be released.

[6] The Settlement Offer also required Yim to execute an attached affidavit stating that she had no other insurance. Yim executed the affidavit and returned it to Carr's attorney.

16

other persons or entities that might be liable for Ms. Carr's injuries[7] and any request for a release of other persons or entities that are or may be liable will constitute a rejection of this offer and a counter-offer to resolve claims against other potentially liable parties.

The enclosed Limited Liability Release is the ONLY release that Ms. Carr will execute. The release is sufficient to protect your insured's assets from Ms. Carr's bodily injury claims and is sufficient consideration for payment of your insured's policy limits. Please do not ask us to indemnify Liberty Mutual or Ms. Yim from other claims, as your policy limits are insufficient to fully compensate Ms. Carr for her pain and suffering arising out of her injuries. . . .

On May 18, 2016, Liberty Mutual's representative responded in writing to the Settlement Offer (the "Response Letter"). Liberty Mutual's Response Letter stated in the first paragraph: "This letter . . . will confirm Liberty Mutual's acceptance of your demand without condition or exception" and that a settlement check of $100,000 was being sent under separate cover "to resolve the referenced matter." The Response Letter provided in the next paragraph that "[t]he balance of this letter is intended[ ]

---

[7] According to Carr's attorneys, they were unaware of the potential vicarious liability of Yim's parents for the automobile collision when the Settlement Offer was made, given that Yim was 28 years old at the time of the collision and the police motor vehicle accident report listed her as the owner of the vehicle she was driving; they began investigating the possibility of the parents' vicarious liability based on Liberty Mutual's response to the Settlement Offer.

. . . to confirm the logistics for concluding the settlement" and then stated in relevant part:

> First, we agree that as consideration for the payment of $100,000.00, Patricia Carr will execute a limited release and settlement agreement resulting from the April 14, 2016 date of loss. We are in receipt of the limited liability release you enclosed with your demand. . . . We have previously forwarded our policy declarations to you, which indicate the named insureds under the policy as John Yim and Bok Yim, with Jenny Yim being a listed driver under the policy. Your proposed limited liability release does not list our named insureds John Yim or Bok Yim.

> Under OCGA § 33-24.41.1 (b) (2), Georgia law establishes that a limited liability release shall "[r]elease the insured tort feasor covered by the policy of the settling carrier from all personal liability from any and all claims arising from the occurrence on which the claim is based except to the extent other insurance coverage is available which covers such claim or claims." In addition, I refer you to *McKeel v. State Farm Mut. Auto. Ins. Co.*, 2015 U.S. App. LEXIS 12698 (11th Cir. 2015) as support for the proposition that a limited liability release must protect each insured in order to provide a liability insurer with an opportunity to resolve a claim against its insureds in consideration of the payment of policy limits. Please contact me to further discuss your limited liability release in regards to our named insureds John Yim and Bok Yim. Pursuant to OCGA § 9-11-67.1 we also request clarification from you

18

that Ms. Carr does not intend to assert claims against the named insureds under the applicable policy. . . .

To reiterate, both our discussions, as well as this letter, are in no way intended to be either a rejection of your demand or a counter-offer. Rather, it is Liberty Mutual's intent to accept your settlement demand unequivocally and without variance. If anything in this letter is inconsistent with our discussions and/or Liberty Mutual's acceptance of your demand, please make me aware immediately. . . .

On June 14, 2016, Carr's attorney sent a letter to Liberty Mutual's representative stating that the Response Letter did not constitute acceptance of the Settlement Offer and was a counteroffer because it sought a limited liability release that included Yim's parents. The June 14 letter further stated that Carr had decided to decline the counteroffer, and Carr's attorney also returned the settlement check that had been tendered by Liberty Mutual. Carr's attorney and Liberty Mutual's representative exchanged further correspondence in which they disputed whether Liberty Mutual's Response Letter had constituted an acceptance of the Settlement Offer.

Carr commenced the subject lawsuit on September 2, 2016, and Yim subsequently filed her motion to enforce the alleged settlement agreement, asserting

that Liberty Mutual's Response Letter constituted an acceptance of Carr's Settlement Offer. Following a hearing, the trial court granted Yim's motion. The trial court found that Liberty Mutual, through its Response Letter, "unequivocally and without condition or exception accepted" the Settlement Offer. The trial court also found that the Response Letter did not constitute a counteroffer because it only sought clarification regarding the legality and scope of the limited liability release attached to the Settlement Offer under OCGA § 90-11-67.1 (d),[8] and because "the mere suggestion that the named insureds might be included in the release was at most a precatory request that did not impose any new conditions of settlement."

On appeal, Carr argues that the trial court erred in finding that the parties had entered into a binding settlement agreement because there was no acceptance and meeting of the minds regarding who would be released and/or because Liberty Mutual's Response Letter constituted a counteroffer. We agree with Carr that there

---

[8] OCGA § 9-11-67.1 (d) provides:
Upon receipt of an offer to settle set forth in subsection (a) of this Code section, the recipients shall have the right to seek clarification regarding terms, liens, subrogation claims, standing to release claims, medical bills, medical records, and other relevant facts. An attempt to seek reasonable clarification shall not be deemed a counteroffer.

20

was no acceptance and meeting of the minds, and thus no enforceable settlement agreement.

> Under Georgia law, an agreement alleged to be in settlement and compromise of a pending lawsuit must meet the same requisites of formation and enforceability as any other contract. In this regard, it is well settled that an agreement between two parties will occur only when the minds of the parties meet at the same time, upon the same subject matter, and in the same sense. An answer to an offer will not amount to an acceptance, so as to result in a contract, unless it is unconditional and identical with the terms of the offer. To constitute a contract, the offer must be accepted unequivocally and without variance of any sort.

(Citation and punctuation omitted.) *Old Peachtree Partners v. Gwinnett County*, 315 Ga. App. 342, 345 (1) (726 SE2d 437) (2012). "No contract exists until all essential terms have been agreed to, and the failure to agree to even one essential term means there is no agreement to be enforced." (Citation and punctuation omitted.) *Moss v. Moss*, 265 Ga. 802, 802 (463 SE2d 9) (1995). See *Moore v. Farmers Bank of Union Point*, 184 Ga. App. 86, 87 (360 SE2d 640) (1987) ("A contract must include all of the material terms; a settlement does not exist until all of the essential terms have been agreed to. OCGA § 13-3-2.").

> In determining if parties had the mutual assent or meeting of the minds necessary to reach agreement, courts apply an objective theory of intent

21

whereby one party's intention is deemed to be that meaning a reasonable person in the position of the other contracting party would ascribe to the first party's manifestations of assent.

(Citation and punctuation omitted.) *Graham v. HHC St. Simons*, 322 Ga. App. 693, 695 (2) (746 SE2d 157) (2013). Guided by these principles, we turn to the record in the present case.

Carr's attorney made the Settlement Offer pursuant to OCGA § 9-11-67.1, "which governs pre-suit offers in suits involving tort claims arising from the use of a motor vehicle," and the Settlement Offer included the five material terms required by the statute, including a specification of the type of release that would be provided by Carr and the party who would be released if the settlement was accepted. *Duenas*, 347 Ga. App. at 441. See OCGA § 9-11-67.1 (a) (setting forth five material terms that must be included in settlement offer).[9] Furthermore, in setting out the settlement terms, Carr's attorney emphasized that the particular limited liability release form attached to the Settlement Offer, which released only Yim from Carr's bodily injury claims, was "the ONLY release that Ms. Carr will execute," and that "any request for a release of other persons or entities that are or may be liable will constitute a

_____

[9] See supra footnote 5.

22

rejection of this offer and a counter-offer to resolve claims against other potentially liable parties." Carr's attorney then reiterated in the June 14 letter to Liberty Mutual's representative that the Settlement Offer unambiguously specified that only Yim would be released and that Carr would not agree to the changes to the release suggested in the Response Letter.

Given this record, a reasonable person in the position of Liberty Mutual would have understood that Carr considered the particular release form attached to the Settlement offer to be essential to her willingness to settle her bodily injury claims and that she would not agree to a settlement that released any parties other than Yim. See *Graham*, 322 Ga. App. at 695-696 (2) (applying objective theory of intent in addressing contract formation). Accordingly, we conclude that an essential term of the Settlement Offer was that only Yim be released from Carr's bodily injury claims. See *Duenas*, 347 Ga. App. at 442 (release of only bodily injury claims was a material term of settlement offer where "the Settlement Offer plainly stated that [the plaintiff] was only offering to settle his personal injury/bodily injury claims").[10] It follows that

_____

[10] See also *Cohen v. Dekalb County School Dist.*, No. 1:09-cv-1153-WSD, 2009 U.S. Dist. LEXIS 110078, at *17-18 (N.D. Ga. Nov. 25, 2009) (confidentiality provision was essential term of contract, where party included such a provision in original offer and insisted upon its inclusion in subsequent communications); *Morrison v. Trust Co. Bank*, 229 Ga. App. 145, 148 (2) (493 SE2d 566) (1997) (provision for inspection of bank's

for Liberty Mutual to accept the Settlement Offer and form a binding contract, it had to agree to the essential term in the Settlement Offer that only Yim be released from Carr's bodily injury claims. See *Duenas*, 347 Ga. App. at 442; *Morrison*, 229 Ga. App. at 148 (2). See also *Atkinson v. Cook*, 271 Ga. 57, 58 (518 SE2d 413) (1999) ("An acceptance must comply with the requirements of the offer as to the promise to be made or the performance to be rendered. This precept is based upon fundamental principles of private autonomy underlying contract law – primarily that an offeror is the master of his or her offer, and free to set the terms thereof.") (punctuation and footnotes omitted).

Construing the evidence in the light most favorable to Carr as the nonmoving party, we conclude that Liberty Mutual did not unequivocally accept the essential term of the Settlement Offer that only Yim be released. Rather, as reflected in the Response Letter from Liberty Mutual's representative and its inclusion of legal citations to OCGA § 33-24.41.1 (b) (2) and *McKeel*, 2015 U.S. App. LEXIS 12698, Liberty Mutual believed that the limited liability release should cover all of its insureds under the insurance policy, including Yim's parents. In the Response Letter,

---

books and records was material contractual term, where bank had removed the inspection provision from the proposed contract on two prior occasions and the other party had left the term in the proposed contract).

Liberty Mutual's representative also asked Carr's attorney to "[p]lease contact me to further discuss your limited liability release in regards to our named insureds[, the parents]," reflecting, when read in context of the aforementioned legal citations, that Liberty Mutual wanted to negotiate with Carr's attorney over the inclusion of Yim's parents in the release. And, while elsewhere in the Response Letter, Liberty Mutual's representative purported to accept the Settlement Offer "without condition or exception," that language is not dispositive in light of the other language in the Response Letter reflecting the lack of agreement over the essential term in the Settlement Offer that only Yim be released. See *Johnson v. Martin*, 142 Ga. App. 311, 312 (235 SE2d 728) (1977) (no settlement reached, where first paragraph of attorney's letter responding to offer "stated acceptance of the offer of settlement," but the third paragraph qualified acceptance of the offer by insisting upon release of other parties). Accordingly, we conclude that Liberty Mutual, through its Response Letter, failed to accept all of the essential terms of Carr's Settlement Offer unequivocally and without variance of any sort, and thus there was no meeting of the minds and no binding settlement reached by the parties. See *Duenas*, 347 Ga. App. at 442 (no settlement reached, where insurance company's representative did not unequivocally accept essential term of settlement offer that plaintiff would only release his bodily

injury claims); *Penn v. Muktar*, 309 Ga. App. 849, 850 (711 SE2d 337) (2011) (no meeting of the minds regarding settlement, where plaintiff's offer was conditioned on written release limited to bodily injury claims, but insurer would only agree to written release of all claims resulting from accident); *Kitchens v. Ezell*, 315 Ga. App. 444, 447-449 (1) (a) (726 SE2d 461) (2012) (physical precedent only) (no binding settlement agreement, where "the offer specified that if State Farm delivered the bodily injury release[ ] . . . within 20 days of the settlement offer, then [the plaintiffs] would sign the release and the bodily injury claims would be settled," but "State Farm purported to accept the [plaintiffs'] offer to settle the bodily injury damage claims but submitted a non-conforming proposed release of any and all claims, including property damage") (emphasis omitted); *Anderson v. Benton*, 295 Ga. App. 851, 855 (1) (673 SE2d 338) (2009) (binding settlement never formed, where demand letter expressly limited which claims and parties the plaintiff intended to release as part of the settlement offer, but insurer required a broader release).[11] Compare *Hansen v.*

---

[11] See also *Graham*, 322 Ga. App. at 697 (2) (no binding settlement reached, where parties never "agreed on the crucial element of consideration at the same time, in the same sense"); *Durham v. McLaughlin*, 286 Ga. App. 166, 167 (648 SE2d 495) (2007) ("Because the parties did not clearly agree on the specific terms of a settlement agreement at the pretrial conference, and since the defense later rejected and varied the terms of the plaintiffs' proposed settlement order, there was no meeting of the minds necessary for the formation of the alleged settlement agreement.").

*Doan*, 320 Ga. App. 609, 614 (1) (740 SE2d 338) (2013) (whole court) (binding settlement agreement formed, where in response to settlement demand, Liberty Mutual tendered the policy limits and delivered a draft limited release to the plaintiff's attorney "with the clear understanding that [the plaintiff's] attorney could tailor the release to fit his demand").

In determining that a binding settlement had been formed, the trial court found that Liberty Mutual was entitled under OCGA § 90-11-67.1 (d) to seek clarification regarding the legality and scope of the limited liability release attached to the Settlement Offer without transforming what would otherwise be an acceptance into a counteroffer. See *Grange Mut. Cas. Co. v. Woodard*, 300 Ga. 848, 857 (2) (B) (797 SE2d 814) (2017) (noting that "OCGA § 9-11-67.1 provides in subsection (d) that the recipient of a Pre-Suit Offer may seek 'reasonable clarification' on the topic of liens and other terms without transforming what would otherwise be an acceptance into a counteroffer"); *Partain v. Pitts*, 338 Ga. App. 298, 301 (787 SE2d 354) (2016) ("[A] mere request for confirmation does not constitute a counteroffer.") (citation and punctuation omitted). However, Liberty Mutual's Response Letter did not merely seek to clarify the limited release, for the Settlement Offer was plain and ambiguous with respect to the release being offered: Carr was offering the release of her bodily

27

injury claims against "JENNY JUNG YIM, and only JENNY JUNG YIM," and the limited liability release attached to the Settlement Offer was "the ONLY release that Ms. Carr [would] execute." The language of the Response Letter, including the references therein to OCGA § 33-24.41.1 (b) (2) and *McKeel*, 2015 U.S. App. LEXIS 12698, reflect that Liberty Mutual, rather than simply requesting more information from Carr's attorney, sought further negotiation over the essential term of the Settlement Offer that only Yim be released from Carr's bodily injury claims, with the goal of adding Yim's parents to the release. And, given the request for continued negotiation over the essential term of who would be covered by the release, Liberty Mutual's Response Letter did not constitute an unconditional and unequivocal acceptance of the Settlement Offer. Consequently, the trial court's reliance on OCGA § 90-11-67.1 (d) was misplaced. See *McReynolds v. Krebs*, 290 Ga. 850, 853-854 (2) (725 SE2d 584) (2012) (rejecting argument that party responding to offer had merely made a request for additional information about liens, given the information that was already available to the party about that issue); *Hardnett v. Ogundele*, 291 Ga. App. 241, 243 (1) (661 SE2d 627) (2008) (pointing out that no binding contract is formed when agreement to an essential term remains unsettled).

The trial court also relied upon the legal principle expressed in several of our cases that the mere suggestion of an unacceptable form of release does not convert an acceptance into a counteroffer. But, in our precedent relying on that legal principle, the settlement offer did not require the other party to accept *a particular release* to effectuate the settlement; in those cases, "the presentation of a proper release in a form acceptable to plaintiff may have been a condition of defendant's performance but it was not an act necessary to acceptance of plaintiff's offer to settle for the policy limits." (Citation and punctuation omitted.) *Turner v. Williamson*, 321 Ga. App. 209, 214 (2) (738 SE2d 712) (2013). See id. at 213 (2) (noting that "[t]he terms of this offer were simple: execution of a limited liability release in accordance with OCGA § 33-24-41.1 in exchange for the policy limits"); *Newton v. Ragland*, 325 Ga. App. 371, 375 (1) (750 SE2d 768) (2013) (terms of offer were simply that plaintiff "would execute a limited liability release pursuant to OCGA § 33-24-41.1 in exchange for the policy limits by a certain deadline"); *Smith v. Hall*, 311 Ga. App. 99, 99-101 (714 SE2d 742) (2011) (settlement offer did not specify how controversy would be terminated in return for the policy limits); *Herring v. Dunning*, 213 Ga. App. 695, 698 (446 SE2d 199) (1994) (whole court) (settlement offer was "silent as to the particular form by which [the plaintiff would] terminate the controversy with

29

the defendant"). Accord *Grange Mut. Cas. Co. v. Kay*, 264 Ga. App. 139, 142 (2) (589 SE2d 711) (2003) ("[T]he drafting of documents necessary to effectuate the settlement may have been a condition of the performance but it was not an act necessary to acceptance of the offer to settle.") (punctuation and footnote omitted). In contrast, where, as here, the offer specifies a particular release that is necessary for effectuating the settlement, there is no acceptance if the responding party does not accept that release. See *Duenas*, 347 Ga. App. at 442 (no binding settlement where plaintiff offered a limited liability release of only his bodily injury claims and there was no unequivocal acceptance of that specific offer); *Penn*, 309 Ga. App. at 850 (no unequivocal acceptance where plaintiff only offered a limited liability release of bodily injury claims and insurer failed to agree to that limitation); *Kitchens*, 315 Ga. App. at 447-449 (1) (a) (no settlement where offer required insurer to deliver release of bodily injury claims for plaintiffs to sign, but insurer delivered a broader release that also covered property damage claims); *Anderson*, 295 Ga. App. at 855 (1) (no settlement where offer expressly limited which claims and parties would be released, but insurer would not agree to those limitations and instead demanded a broader release). Because the Settlement Offer conditioned Liberty Mutual's acceptance on a particular limited liability release, the legal principle relied upon by the trial court

– that the mere suggestion of an unacceptable form of release does not transform an acceptance into a counteroffer – is inapplicable in this case.

For these combined reasons, there was no unequivocal acceptance of Carr's Settlement Offer by Liberty Mutual, and thus no meeting of the minds and no binding settlement. The trial court's grant of Yim's motion to enforce the alleged settlement agreement therefore is reversed.

*Judgments reversed in Case Nos. A19A0715 and A19A0716. Mercier and Brown, JJ., concur.*

31