**THIRD DIVISION**
**MCFADDEN, C. J.,**
**DOYLE, P. J., and HODGES, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**March 11, 2021**

# In the Court of Appeals of Georgia

A20A1868. WRIGHT v. NELSON.                                  DO-064

DOYLE, Presiding Judge.

John Nelson filed this personal injury suit against Howard Wright and three John Does, seeking damages for injuries allegedly caused by Wright in an automobile collision. Wright now appeals from the trial court's denial of his motion to enforce a settlement agreement, contending that the trial court erred by ruling that he did not accept Nelson's offer of settlement demanding the insurance policy limit in exchange for a limited liability release containing certain terms specified by Nelson. Specifically, Wright argues that he accepted the offer of settlement when he tendered the requested policy limit and indicated his intent to follow up with a release, thereby rendering the parties' subsequent failure to execute the release a matter of contract performance, not contract formation. We agree and reverse.

We apply a de novo standard of review to a trial court's order on a motion to enforce a settlement agreement. Because the issues raised are analogous to those in a motion for summary judgment, in order to succeed on a motion to enforce a settlement agreement, a party must show the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of the appellant['s] case. Thus, we view the evidence in a light most favorable to the nonmoving party.[1]

So viewed, the record shows that on April 18, 2019, Nelson filed a complaint seeking damages from Wright and three John Doe defendants based on a car collision involving Nelson and Wright. The same day, Nelson's attorney sent an offer of settlement via fax and certified mail to Wright's insurance carrier, Allstate Metro MCO, offering "to settle Mr. Nelson's claim for . . . $25,000." The offer letter requested Allstate to "immediately notify your insured that it is presently possible to settle the claims that my client has against him within the limits of available insurance coverage" and stated that the offer would remain open for acceptance until May 28, 2019, after which time it would be deemed automatically withdrawn.

---

[1] (Punctuation omitted.) *Tillman v. Mejabi*, 331 Ga. App. 415 (771 SE2d 110) (2015), quoting *Johnson v. DeKalb County*, 314 Ga. App. 790, 791 (726 SE2d 102) (2012).

2

In exchange for accepting the $25,000 policy limit, the letter stated that Nelson would "sign a 'Limited Liability Release' as that term is used and contemplated under Georgia law." The letter contained explicit conditions upon which the offer was contingent:

(1) my client will only release and discharge Howard Wright, Allstate Metro MCO, including its agents, employees and the like, pursuant to a limited liability release;

(2) my client will execute a limited liability release and only release and discharge the above named individual and Allstate Metro MCO Policy No. 803170759, and no-one else, from any claims, demands, rights and causes of action for injury as a result of this loss — meaning all claims for underinsured motorist coverage, excess coverage or umbrella coverage, to the extent any such claims exist, are not released;

(3) my client will only agree to provide an indemnification for "legally enforceable" liens asserted by any hospital, nursing home, physician practice or traumatic burn care medical practice who is subject to the [Hospital Lien Statute];

(4) my client will only agree to provide an indemnification for "legally enforceable" liens asserted by any governmental agency such as Medicaid, Medicare, Champus, Tri-Care or the like;

3

(5) my client will not agree to affirm or warrant to pay any liens, rights of reimbursement or subrogation because he has not been made whole;

(6) my client will not waive any rights discussed in *Posev v. Medical Center West, Inc*., 257 Ga. 55 (354 SE2d 417) (1987) as this is contrary to the law established by *Posey*;

(7) my client will not agree to any language indicating that [he] has been counseled or encouraged to either review or to execute any release as this recitation would introduce a conflict of interest;

(8) the undersigned will only witness the executed release and will not supply a recital purporting to ratify, approve, explain or guarantee signature of said release as this recitation would introduce a conflict of interest;

(9) my client will only execute an affidavit verifying his knowledge of any "properly filed" liens asserted by any hospital, nursing home, physician practice or traumatic burn care medical practice who is subject to the provisions of OCGA § 44-14-470.

On May 15, 2019, an Allstate representative sent a letter stating "Allstate has agreed to pay our policy limits of $25,000. We will have one of our defense attorneys contact you about the release." A week later, on May 22, Nelson's attorney wrote a

letter confirming receipt of the check and stating, "You indicated that Allstate will have a defense attorney contact me about a Release. I have not heard from anyone on this issue and do not have a Release. Can you please follow up?" Receiving no immediate response, Nelson's attorney sent additional requests for the release on May 30, June 5, and June 13. On June 17, Allstate's attorney sent an email with an attached release ("Allstate Release"), stating, "Please find Allstate's proposed LLR attached to this email. A hard copy is being mailed to you today. If this meets with your approval, please have your client sign it and return the original to me." Approximately two weeks later, on July 3, Wright's attorney filed an answer to the complaint along with a counterclaim.

On July 21, Nelson's attorney sent a letter to Allstate stating that the Allstate Release "varies certain material terms and constitutes a rejection/counteroffer." The letter identified the alleged inconsistent terms, including: releasing Allstate Fire and Casualty Insurance Company "in its entirety" (as opposed to only Allstate Metro MCO), adding a release of property damage not included in the settlement offer, and adding an affirmation that there are no unpaid liens or claims for benefits "of any kind" (not just legally enforceable hospital liens).

5

On September 26, Allstate's attorney replied by email, purporting to attach an edited version with revisions pertinent to the first two issues and addressing the third issue by pointing out that the release of Allstate was to the extent of its liability for its insured, but not to the extent of any uninsured/underinsured motorist coverage or other insurance. Despite this description in the email, the attached release was identical to the first version Allstate sent, apparently included by mistake.

In October 2019, Wright's attorney filed a motion to enforce the settlement agreement. Nelson opposed the motion, and following a hearing, the trial court denied the motion, giving rise to this appeal.

Wright contends that the trial court erred by ruling that Allstate's May 15 response was not an unequivocal acceptance of Nelson's offer to settle the case for the policy limits. We agree.

> Under Georgia law, an agreement alleged to be in settlement and compromise of a pending lawsuit must meet the same requisites of formation and enforceability as any other contract. In this regard, it is well settled that an agreement between two parties will occur only when the minds of the parties meet at the same time, upon the same subject matter, and in the same sense. An answer to an offer will not amount to an acceptance, so as to result in a contract, unless it is unconditional and

6

identical with the terms of the offer. To constitute a contract, the offer must be accepted unequivocally and without variance of any sort. No contract exists until all essential terms have been agreed to, and the failure to agree to even one essential term means there is no agreement to be enforced. In determining if parties had the mutual assent or meeting of the minds necessary to reach agreement, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable person in the position of the other contracting party would ascribe to the first party's manifestations of assent.[2]

Here, it is undisputed that Nelson offered to settle the case for $25,000 in exchange for a limited liability release meeting certain specified conditions outlined in his April 18 letter to Allstate. The offer referenced OGGA § 9-11-67.1 and included the essential terms contemplated by that Code section: time period of acceptance, amount of payment, a release requirement, the type of release, and the claims to be released. Allstate timely responded that it "agreed to pay our policy limits of $25,000," listed the claim number and insured, tendered the check, and stated that it would have its attorney contact Nelson's attorney about the release. Allstate's response did not add any conditions to its agreement to pay the policy limits, nor did it indicate any objection to the release terms requested by Nelson.

---

[2] (Citations and punctuation omitted.) *Yim v. Carr*, 349 Ga. App. 892, 903-904 (2) (827 SE2d 685) (2019).

Under these circumstances, the parties had reached an enforceable settlement agreement: "An offer may be accepted . . . either by a promise to do the thing contemplated therein, or by the actual doing of the thing."[3] Allstate paid the $25,000 and indicated its intent to begin the process of executing a release.

> From that moment on, the presentation of a proper release in a form acceptable to plaintiff may have been a condition of [Allstate's] performance but [absent an explicit requirement from Nelson, Allstate's actual tender of an acceptable release] was not an act necessary to acceptance of [Nelson's] offer to settle for the policy limits. Moreover, since the agreement to terminate the controversy already had been created, [Allstate's] subsequent proffer of a release form which [Nelson] believed was not in compliance with the understanding of the parties [was] not . . . a rejection of the previously accepted offer.[4]

This is true particularly in light of the language accompanying Allstate's first proposed release: "*If this meets with your approval*, please have your client sign. . .

---

[3] (Punctuation omitted.) *Herring v. Dunning*, 213 Ga. App. 695, 699 (446 SE2d 199) (1994), quoting *Sheffield v. Whitfield*, 6 Ga. App. 762, 764 (2) (65 SE 807) (1914). See also *Barnes v. Martin-Price*, 353 Ga. App. 621, 626 (838 SE2d 916) (2020) ("It is well established that the delivery and acceptance of a check stating on its face that it constitutes final settlement of a claim, whether the amount of the claim is established or uncertain, amount to an accord and satisfaction which discharges the claim.") (punctuation omitted), quoting *Rabenstein v. Cannizo*, 244 Ga. App. 107 (534 SE2d 847) (2000).

[4] *Herring*, 213 Ga. App. at 699-700.

."[5] An objectively reasonable person would understand by this precatory language that Allstate was seeking Nelson's approval, not objecting to the terms of the offered release agreement.[6] The subsequent correspondence further indicates that Allstate attempted to capture Nelson's specified release terms in a revised draft, even if the original draft was erroneously substituted for the revised version.

Because the undisputed record shows that Allstate accepted Nelson's settlement offer, the trial court erred by denying Wright's motion to enforce the settlement agreement according to those terms.

*Judgment reversed. Hodges, J., concurs. McFadden, C. J., concurs fully and specially.*

---

[5] (Emphasis supplied.)

[6] "Precatory words are those words that indicate 'entreaty, recommendation, or expectation rather than any mandatory direction.'" *Newton v. Ragland*, 325 Ga. App. 371, 374 (1) (750 SE2d 768) (2013), quoting *Herring*, 213 Ga. App. at 699.

A20A1868. WRIGHT v. NELSON.

MCFADDEN, Chief Judge, concurring fully and specially.

I concur fully in the majority opinion. The majority correctly holds that a settlement agreement was formed because the plaintiff's settlement offer did not specify that presentation of a conforming release was a precondition to acceptance of the offer. But the offer could have so specified; and if it had so specified, no settlement agreement would have formed.

I write separately to address the ongoing efforts of the courts and the General Assembly to address the unintended consequences of our Supreme Court's decision in *Southern Gen. Ins. Co. v. Holt*, 262 Ga. 267 (416 SE2d 274) (1992). I suggest that

the General Assembly may want to consider an additional legislative remedy. The holding in *Holt* is: "an insured has a claim for bad faith against an insurance company for its failure to settle a claim within the policy limits based on a time-limited settlement offer by the injured person's attorney." Id.

*Holt* expressly disavows any "inten[t] to lay down a rule of law that would mean that a plaintiff's attorney . . . could 'set up' an insurer for an excess judgment merely by offering to settle within the policy limits and by imposing an unreasonably short time within which the offer would remain open." *Holt*, 262 Ga. at 169 (1). So *Holt* implicitly disavows any intent to enable a plaintiff's attorney to set up an insurer by any other device.

But plaintiffs' attorneys have incentives contrary to that judicial intent. It has become clear that, to a plaintiff whose injuries greatly exceed the available coverage, a policy-limits settlement can be less valuable than a rejected offer and consequent bad-faith claim — however dubious the claim. In the context of proceedings to enforce purported settlements, plaintiffs sometimes structure offers not to reach settlements, but rather to elicit rejections. See generally Douglas R. Richmond, An Overview of Insurance Bad Faith Law and Litigation, 25 Seton Hall L. R. 74, 131 (VI) (B) (1994) (noting potential of a third-party insurance claimant "tr[ying] to 'set

2

up' a bad faith claim by way of sharp practice"). And our decision today provides instruction on how offers can be structured to avoid today's result and set up bad faith claims.

I have expressed concern in the past that such tactics have tempted us, in settlement enforcement actions, to improperly abridge the fundamental rule that "one who makes an offer is master of the offer. A purported acceptance that fails to meet every condition of an offer — however unreasonable the condition — is a counteroffer and does not create a contract." *Hansen v. Doan*, 320 Ga. App. 609, 619 (740 SE2d 338) (2013) (McFadden, J., dissenting).

Selectively abridging that fundamental rule is, however, properly within the authority of the legislature. And the day after *Hansen* was decided, the General Assembly passed OCGA § 9-11-67.1, which is set out in the margin.[1] As

---

[1] (a) Prior to the filing of a civil action, any offer to settle a tort claim for personal injury, bodily injury, or death arising from the use of a motor vehicle and prepared by or with the assistance of any attorney on behalf of a claimant or claimants shall be in writing and contain the following material terms:

      (1) The time period within which such offer must be accepted, which shall be not less than 30 days from receipt of the offer;

      (2) Amount of monetary payment;

      (3) The party or parties the claimant or claimants will release if such offer is accepted;

      (4) The type of release, if any, the claimant or claimants will provide to each releasee; and

3

authoritatively construed in a divided opinion of our Supreme Court, that statute

selectively abridges offerors' mastery of offers to settle certain tort cases — but to a

---

        (5) The claims to be released.

       (b) The recipients of an offer to settle made under this Code section may accept the same by providing written acceptance of the material terms outlined in subsection (a) of this Code section in their entirety.

       (c) Nothing in this Code section is intended to prohibit parties from reaching a settlement agreement in a manner and under terms otherwise agreeable to the parties.

       (d) Upon receipt of an offer to settle set forth in subsection (a) of this Code section, the recipients shall have the right to seek clarification regarding terms, liens, subrogation claims, standing to release claims, medical bills, medical records, and other relevant facts. An attempt to seek reasonable clarification shall not be deemed a counteroffer.

       (e) An offer to settle made pursuant to this Code section shall be sent by certified mail or statutory overnight delivery, return receipt requested, and shall specifically reference this Code section.

       (f) The person or entity providing payment to satisfy the material term set forth in paragraph (2) of subsection (a) of this Code section may elect to provide payment by any one or more of the following means:

              (1) Cash;

              (2) Money order;

              (3) Wire transfer;

              (4) A cashier's check issued by a bank or other financial institution;

              (5) A draft or bank check issued by an insurance company; or

              (6) Electronic funds transfer or other method of electronic payment.

       (g) Nothing in this Code section shall prohibit a party making an offer to settle from requiring payment within a specified period; provided, however, that such period shall not be less than ten days after the written acceptance of the offer to settle.

       (h) This Code section shall apply to causes of action for personal injury, bodily injury, and death arising from the use of a motor vehicle on or after July 1, 2013.

limited extent. See *Grange Mut. Cas. Co. v. Woodard*, 300 Ga. 848 (797 SE2d 814) (2017).

*Grange* construed OCGA § 9-11-67.1 in light of "the backdrop of a large body of law" under which an acceptance is effective only if "the offer [is] accepted unequivocally and without variance of any sort" because "an offeror is the master of his or her offer, and free to set the terms thereof." *Grange*, 300 Ga. at 852-853 (2) (a) (citations and punctuation omitted). *Grange* "conclude[d] that the plain language of OCGA § 9-11-67.1 does not expressly or by necessary implication contravene these common law principles." Id. at 854 (2) (b).

So as authoritatively construed in *Grange*, subsection (a) of OCGA § 9-11-67.1 requires that five specified material terms "*shall*" be included in an offer and be in writing, and subsection (b) provides that at least those five material terms must be accepted in writing. But that acceptance does not form a settlement agreement if the offer includes additional terms and the recipient of the offer does not accept those additional terms. *Grange*, 300 Ga. at 855–856.

*Grange* rejected a broader interpretation. Under that rejected interpretation, subsection (b) endows the recipient of an offer with a power, beyond that provided by the common law, to form a settlement agreement. The text of subsection (b)

5

provides that the recipient of an offer conforming to subsection (a) "*may* accept the same by providing written acceptance of the material terms outlined in subsection (a) of this Code section in their entirety[.]" OCGA § 9-11-67.1 (b) (emphasis supplied). Under that rejected interpretation, such acceptance would form a settlement agreement — regardless of any additional terms the offeror undertook to include. *Grange*, 300 Ga. at 855-856 (2) (b).

Subsection (c), under this rejected interpretation, would simply clarify that subsections (a) and (b) come into play only if the parties disagree about whether a settlement agreement had been reached. See *Grange*, 300 Ga. at 851 (1), 855 (2) (b); see also *Grange* at 861 (Melton, P.J., dissenting).

Subsection (d), *Grange* affirms, allows recipients to seek clarification of offers. Offerors are precluded from declaring requests for clarification to be counteroffers. *Grange*, 300 Ga. at 857 (2) (b).

*Grange* does not construe subsection (e), which specifies how an offer may be transmitted and requires that offers cite the statute. Nor does *Grange* construe subsection (f), which mandates that certain specified forms of payments be acceptable.

Subsection (g) provides that an offer may not impose a payment deadline of less than 10 days after acceptance of the offer. But *Grange* holds, over dissent, that meeting the payment deadline may be a precondition of acceptance. *Grange*, 300 Ga. at 857 (2) (b) & n. 8.

So as authoritatively construed in *Grange*, OCGA § 9-11-67.1 removes some of the mastery of offerors over their offers, but only some. As a consequence, the statute prevents some, but only some, of the tactics used to set up insurers for bad faith claims.

But the much greater abridgement of freedom of contract entailed in the rejected interpretations of subsections (a), (b), and (g), summarized above, would have prevented many more of those tactics and might even have put an end to such maneuvering.

*Grange* does not indicate that the General Assembly is without power to impose a greater abridgment. Its holding rests on a principle of statutory interpretation under which "common-law rules [remain] of force and effect in this State, except where they have been changed by express statutory enactment or by necessary implication." *Grange*, 300 at 854 (2) (b) (citing *Humphreys v. State*, 287

7

Ga. 63, 70 (4) (694 SE2d 316) (2010)).[2] So if it is the will of the General Assembly

to enact those rejected interpretations of subsections (a), (b), and (g) — and to

abridge freedom of contract to that extent — it can apparently do so by "expressly

_____

[2] In setting out that principle of statutory construction, *Grange* does not address the principle set out at OCGA § 1-3-1 (a): "In all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy."

Sometimes called the mischief rule, the rule now set out at OCGA § 1-3-1 (a) appears in the second volume of Georgia Reports, where the authority cited for it is Blackstone's Commentaries on the Law of England. *Booth v. Williams*, 2 Ga. 252, 254 (1847) (citing 1 Black. Com. 87). Our Supreme Court "regards Blackstone as an authority on the common law." *Grange*, 300 Ga. at 853 (2) (a) (quoting *Tucker v. Howard L. Carmichael & Sons*, 208 Ga. 201, 203 (1) (65 SE2d 909) (1951)). But instead of addressing OCGA § 1-3-1 (a) or the mischief rule, *Grange* cites, in a footnote, to recent decisions implicitly criticizing it. See *Grange*, supra at 857 (2) (b) n. 8.

Applying that rule here might have led to a different outcome. The old law is the common law of contract formation — that the offeror is master of the offer, together with the rule set out in *Holt*, under which an insurer can be subject to bad faith liability.

The evil or mischief is the incentive created by the interaction of those two rules to set up bad faith claims. See *Grange*, 300 Ga. at 856-857 (2) (b) ("In understanding the work that OCGA § 9-11-67.1 performs, it is helpful to recall the legal environment in which it was enacted. Our 1992 decision on an insurer's duty to its insured when faced with a settlement demand, *Southern General Insurance Co. v. Holt*, 262 Ga. 267, 268 (1) (416 SE2d 274) (1992), spawned much litigation[.] . . . OCGA § 9-11-67.1 speaks to those issues.") (footnote omitted); id. at 857 (2) (b) n. 4 ("Although this case does not call on us to consider whether Grange acted in bad faith, Georgia case law on insurers' duties to their insured, specifically our decision in *Holt*, looms in the background.").

The remedy is some amount of abridgement of freedom of contract and of an offeror's authority over the offer.

8

contraven[ing] those common law principles." *Grange*, supra at 856 (2) (b); see also id. at 852-853 (2) (a).

Alternatively, the General Assembly could focus on the bad faith claims themselves. It could address the issue by setting out a safe harbor, specifying conduct by insurers that would constitute good faith as a matter of law.